K488LIMC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

           v.                           19 Cr. 651 (LTS)

NIKOLAOS LIMBERATOS,

              Defendant.         Telephone Conference

------------------------------x

                                New York, N.Y.
                                April 8, 2020
                                2:30 p.m.

Before:

                HON. LAURA TAYLOR SWAIN,

                                District Judge

                      APPEARANCES

GEOFFREY S. BERMAN,
    United States Attorney for the
    Southern District of New York
ROBERT SOBELMAN
SAMUEL P. ROTHSCHILD
    Assistant United States Attorneys

KARLOFF C. COMMISSIONG
    Attorney for Defendant

ALSO PRESENT:  LEA HARMON, Pretrial Services

K488LIMC

1          (The Court and all parties appearing telephonically)

2          (Case called)

3          THE COURT:  Good afternoon.

4          First, I would like to confirm that the court

5    reporter, Ms. Giniger, is on the line.

6          THE REPORTER:  Yes, I am.

7          THE COURT:  Now, would the assistant United States

8    attorneys state their appearances, please.

9          MR. SOBELMAN:  Robert Sobelman for the United States.

10   I am joined on this call by Samuel Rothschild, another

11   assistant US attorney in our office, and Taylor Tescher, an

12   intern in our office.  Good afternoon, your Honor.

13         THE COURT:  Good afternoon, Messrs. Sobelman and

14   Rothschild.

15         And Ms. Tescher, I believe it is.  Good afternoon.

16         Would defense counsel please state his appearance.

17         MR. COMMISSIONG:  On behalf of Mr. Limberatos, Karloff

18   Commissiong.  Good afternoon, your Honor.

19         THE COURT:  Good afternoon, Mr. Commissiong.

20         And would the pretrial services officer please state

21   her appearance.

22         MS. HARMON:  Good afternoon, your Honor.  Lea Harmon.

23         THE COURT:  Good afternoon, Ms. Harmon.

24         Is anyone else other than court personnel on the line?

25         All right.  I would just ask that all participants

K488LIMC

1    mute when you don't expect to be speaking for a period of time.

2    And I remind everyone that neither recording nor retransmission

3    of this proceeding is permitted.

4           A bit about logistics.  I will be calling on each

5    speaker during the proceeding.  When I do, please identify

6    yourself by name for clarity of the record.  And please don't

7    interrupt each other or me during the conference.  If we

8    interrupt each other, it's difficult to create an accurate

9    transcript of these proceedings.  Having said that, I apologize

10   in advance because I may interrupt when I have questions, and

11   thank you for bearing with that.  I will give each of the

12   attorneys an opportunity to make additional comments or ask

13   questions at the end of the proceeding.  If anyone has any

14   difficulty hearing me or another participant, please let me

15   know right away.

16          We are in the midst of the COVID-19 pandemic.  I am

17   conducting this application for bail review and/or temporary

18   release telephonically pursuant to the authority provided by

19   Section 15002 of the CARES Act and the standing orders issued

20   by our chief judge pursuant to that act.  Videoconferencing is

21   not reasonably available for today's proceeding.

22          Counsel are appearing by telephone and Mr. Limberatos

23   is not here and is not participating.  Mr. Commissiong filed

24   docket entry number 229 yesterday, a letter in which he states

25   that Mr. Limberatos consents to the telephonic proceeding and

K488LIMC

1    waives his personal appearance.

2           Mr. Commissiong, would you please give us a little bit

3    more context by way of explanation of what you discussed with

4    Mr. Limberatos in terms of his rights and the basis of your

5    understanding as to whether his consent is knowing and

6    voluntary and whether it would have been feasible to get that

7    consent in writing from him.

8           MR. COMMISSIONG:  Yes, your Honor, certainly.

9           I had a conversation with Mr. Limberatos yesterday

10   afternoon.  He was released, as everyone is aware.  The MCC is

11   currently on a two-week lockdown.  Mr. Limberatos was released

12   with three or four other inmates briefly in order to make a

13   phone call from the counselor's office, and during that phone

14   call I explained to him that the hearing in which I put forth

15   the bail application was going to be heard, was scheduled to be

16   heard today.  I explained to him that it was scheduled to take

17   place telephonically and that I needed his consent in order to

18   have the proceeding take place telephonically, and I also

19   needed his consent -- and I attempted to explain in the

20   simplest way possible.  I explained to him that I needed his

21   consent so that he wouldn't need to appear, because

22   logistically it's just not feasible for him to appear at this

23   proceeding.  He explained that he understood and that he

24   consented to both not being present at the hearing and having

25   the proceeding occur telephonically.

K488LIMC

1          THE COURT:  So are you persuaded that he did

2     understand and that his consent is knowing and voluntary?

3          MR. COMMISSIONG:  Absolutely.

4          THE COURT:  I find based on Mr. Commissiong's

5     explanation and representation that Mr. Limberatos's waiver is

6     knowing and voluntary, and that in light of the circumstances

7     at the MCC, the telephonic communication was the feasible way

8     of obtaining that indication of consent and written consent was

9     not feasible in the circumstances.

10          Thank you, Mr. Commissiong.

11          Mr. Limberatos is currently detained pursuant to the

12     Court's October 25, 2019 order, and he seeks reopening of that

13     detention hearing and release on conditions under Section

14     3142(f) of Title 18 or temporary release on conditions under

15     Section 3142(i) of Title 18.

16          I have received and reviewed the pretrial services

17     report, which is dated October 10, 2019; the submissions from

18     defense counsel, dated March 27, 2020, April 2, 2020, and April

19     7, 2020; and the government's submission, dated April 1, 2020.

20          Are there any other written submissions that the

21     parties intend me to have considered in connection with this

22     proceeding?

23          MR. SOBELMAN:  No, your Honor.

24          MR. COMMISSIONG:  Nothing for the defense, your Honor.

25          THE COURT:  Thank you.

K488LIMC

1          So at this point, Mr. Commissiong, I would invite you

2     to make your application for reopening and for temporary

3     release.

4          MR. COMMISSIONG:  Thank you, your Honor.

5          I think that everything that I wanted to communicate

6     to the Court regarding this issue I have detailed in both

7     submissions, but I would like the Court to focus on just a

8     couple of things.

9          First, I would like the Court to focus on the

10    unsanitary conditions in MCC and in BOP facilities in general.

11    During normal times, the pre-coronavirus period, conditions at

12    the MCC, MDC, other BOP facilities are, at best, unsanitary,

13    for lack of a better word.  Those unsanitary conditions,

14    combined with the lack of space, combined with the number of

15    individuals at the MCC, make this a Petri dish for the spread

16    of the coronavirus; it makes it a Petri dish for the spread of

17    the disease COVID-19.

18         Since the lockdown that has occurred in connection

19    with one or a few of the individuals testing positive at MCC,

20    inmates at MCC have been quarantined to their cells with their

21    bunkmates, because there are two individuals to a cell, and

22    recently they were released in their tiers.  Mr. Limberatos

23    explained to me that when the individuals go out to their

24    tiers, it's sort of business as usual, so to speak, people move

25    around like they would during normal times, which would aid in

K488LIMC

1    transmission of COVID-19 if someone would have it.  But we

2    don't know who has it and who doesn't many times because the

3    disease spreads among people who are asymptomatic.

4            I would like the Court to focus on the fact that the

5    BOP is not actively testing people.  They may be taking

6    people's temperatures, people who appear symptomatic, but they

7    are not actively testing members of the population; they are

8    not actively testing inmates.  And if we don't test, we don't

9    know; if we don't test, we can't know, your Honor, who has the

10   disease and who doesn't.

11           So, essentially, BOP staff are waiting for people to

12   cough, are waiting for people to complain of chest pain, are

13   waiting for people to have fevers.  They are waiting for people

14   to become symptomatic before they quarantine individuals,

15   before they send people out to get tested.  And when they bring

16   those individuals back, in many instances they are putting them

17   in the same unit they came from until those test results

18   arrive.  And I think I put in my most recent submission that

19   that was done with at least one or two individuals in 11 South,

20   which is directly across from 11 North where Mr. Limberatos is,

21   the unit Mr. Limberatos is in.

22           I would like the Court to also focus on the difficulty

23   that I had in contacting -- and this goes to the Sixth

24   Amendment issue that I raised.  I would like the Court to focus

25   on the difficulty that I had in arranging a phone call with Mr.

K488LIMC

1   Limberatos, and it was a brief phone call, and it could only be

2   a brief phone call because there were other people waiting on

3   line for the phone at the counselor's office.  There were at

4   least two e-mails in connection with your Honor's order sent to

5   MCC Legal in order to schedule a phone call with Mr.

6   Limberatos, AUSA Sobelman sent an e-mail communicating with MCC

7   Legal, and MCC Legal never contacted me in connection with

8   scheduling a call.

9           In terms of being able to discuss this case, at the

10  very least talking about discovery that I have seen, discovery

11  that he has seen, these logistics make it impossible to prepare

12  any kind of defense.  And while there is no trial scheduled or

13  no hearing scheduled, it makes it inordinately difficult to

14  schedule a hearing, it makes it inordinately difficult to

15  schedule a trial; it makes it difficult to prepare a defense.

16          The fact that inmates are on a lockdown and they don't

17  know when they will be released, and when they are released

18  they are released for only a brief period of time, either to go

19  on computers that we don't believe are wiped clean in any way,

20  or go on phones that we don't believe are wiped clean in any

21  way, or to take a shower that everyone in the tier -- one

22  shower or two showers that everyone in the tier has to use,

23  they are released for a brief period of time, and that's not

24  enough time to review discovery, your Honor.  Logistically,

25  these circumstances will prevent or hinder Mr. Limberatos's

K488LIMC

Sixth Amendment rights.  It will prevent us from preparing an
adequate defense.

I will also sort of segue back into the conditions in
the BOP.  If inmates are being released every three days, or
every four days, while in lockdown, they are being released
into a common area in the tier, then the purpose of the
quarantine in the first place is sort of thwarted.  Because,
again, you don't know whether the people showing no symptoms
are actually people who are infected by the virus but are
asymptomatic, and you don't know whether they are spreading it
in the common area, you don't know whether they are spreading
it in the lounge areas, you don't know whether they are
spreading it in the shower.  You just don't know.  It makes the
conditions at the MCC precarious.

And again, Mr. Limberatos is 54 years old, and while
the government pointed out in their submission that the CDC
says individuals, in terms of age, individuals 65 are more
susceptible to severe illness, the New York City Health
Department, I pointed out, states that people over 50 are
susceptible to severe illness.  And while those are
contradictory statements, I would stress that we are in an era
where information is developing on a daily basis, on an hourly
basis, research is continuing as we speak, and we have got to
go on the best knowledge that we have; and if the New York City
Health Department feels confident enough to put out that people

K488LIMC

over 50 have to take extra precautions and people over 50 are
susceptible to severe illness, I think that that is something
that we have to pay attention to when deciding this issue.

Just as a matter of logistics, should your Honor
temporarily release him, or release him for the extent of the
pretrial period, he would either be staying with the mother of
his children, Ms. Flora Perrada, at 25 Wellington Avenue, Deer
Park, New York 11729, or at a house owned by his brother,
Athanasios Lymberatos.  Lymberatos is spelled with a "Y" with
respect to his brother's name.  The address is 29-44 164th
Street, Flushing, New York -- I'm sorry, your Honor, I just
gave you the wrong address where he would be staying.  It's
46-34 202nd Street, Bayside, New York 11361.  And he would be
staying at that address with his niece, his brother's daughter,
Angeliki Lymberatos.

I have nothing further at this moment, your Honor.

THE COURT:  Thank you.

I will turn to Mr. Sobelman for his remarks, please.

MR. SOBELMAN:  Yes, your Honor.

I will be brief because I think we responded to most
of these points in our detailed letter.  But, of course, we are
able to answer any questions the Court may have after I
conclude.

To respond to Mr. Commissiong, with respect to his
claims about testing or sanitary conditions, we don't think the

K488LIMC

```
1    Court needs to do a detailed examination of whether, for

2    example, keyboards are being cleaned.  Mr. Commissiong is

3    speculating.  These are some things that were not in his

4    submission.  We can't on the spot confirm whether particular

5    steps are being taken, although we are certain that the BOP

6    with the resources they have are doing everything they can to

7    protect the inmates that are in their care, and we have laid

8    out in our letter the various steps that have been taken by the

9    BOP, both at the MCC specifically and more generally.

10         I will note that the testing regime that Mr.

11   Commissiong describes, assuming it's true, is the same for

12   individuals not in a prison setting, which is it is unusual or

13   not permitted, as far as we understand it, at this point, given

14   the limited number of tests, for individuals who are not

15   symptomatic to be tested for COVID-19.

16         I will briefly address the Sixth Amendment

17   allegations.  I want to note that it is the government's

18   understanding, and the Court may be aware of this, that the

19   court is working with both the MCC and the MDC in order to

20   create a system which should be coming online fairly soon by

21   which the court will be able to have proceedings by

22   videoconference with the detained individuals, probably in the

23   mornings, and then in the afternoons there will be access for

24   the inmates to have calls with counsel or similar contacts that

25   they need in order to make sure they are prepared for any
```

K488LIMC

1    proceedings that might be coming up or other litigation-related

2    conversations that need to happen.

3           The government's understanding is that the MCC

4    specifically is actually receiving an influx of additional

5    staff today from another facility so that they can make sure

6    they are meeting the demands specifically related to contact

7    with counsel because they have recognized that it's been

8    difficult over the last week or two to make sure there are

9    sufficient staff to accompany inmates from their cells to the

10   locations where legal calls can be made.

11          These are unusual times where BOP and the rest of us

12   are facing extraordinary challenges.  There is no indication

13   that BOP and MCC are not working diligently to make sure that

14   they are providing for the inmates that they have.  Things are

15   not perfect right now, and we don't contend otherwise, but it

16   is difficult to see how a couple of weeks of limited

17   communication between Mr. Limberatos and his counsel in this

18   particular case, given the timeline, meaningfully infringes on

19   any right he may have, although, of course, the government

20   would prefer that he has open access to his attorney.

21          I would note that there are a couple of things that I

22   think the defense has taken no issue with, which is Mr.

23   Limberatos is not similarly situated to the other cases that he

24   identified in his opening filing.  We drew out some of the

25   distinguishing factors, for example, with the *Stephens* case,

K488LIMC

the *Hudson* case, the *Doran Santiago Reyes* case.  Of course,

every bail determination is individualized and each person in

each case is different, but to the extent the Court is looking

to see what other judges have done in the recent days, we don't

see a case similar to this one where a defendant who, in the

MCC's view and in the government's view, is not in a high-risk

category was released, especially where he is an extraordinary

risk of flight.

          The government is available to answer any questions

the Court may have, and we appreciate the opportunity to

address the Court.

          THE COURT:  Thank you.  I would just ask that you

elaborate further, if possible, and in any event reiterate

clearly for the record, your position as to the significance in

connection with risk of flight of Mr. Limberatos's proffer of a

waiver of extradition.

          MR. SOBELMAN:  Yes, your Honor.  We have addressed

this in our letter, but I will explain it briefly on the record

now.

          THE COURT:  You did address it in your letter.  You

made a general statement in your letter that you have never

heard of one of these holding up.  If you have anything more to

add to that or contextualize that, I would be grateful.

          MR. SOBELMAN:  Understood, your Honor.

          We consulted with the Office of International Affairs,

K488LIMC

1    which is located at Main Justice in Washington, D.C., and they

2    are really the department's experts on these type of issues.

3    And they are not aware of any country in which such a waiver

4    would be considered binding, meaning that it might be a factor

5    that a country took into account when they decide whether to

6    grant or deny extradition, but there are a number of different

7    arguments that would be available to the defendant even if he

8    had signed such a waiver.

9         So, for example, the government's understanding is

10   that defendants in other cases have been successful in fleeing

11   and then arguing in the jurisdiction to which they have fled,

12   and then the government has sought extradition, to be able to

13   argue, well, I signed it under duress because I wanted to not

14   be in prison in the United States, or the prosecution somehow

15   had a political flavor, a variety of arguments one could

16   imagine, and that a foreign government would decide that indeed

17   it was not knowing and voluntary.  And depending on the

18   country, it really does vary country by country, such waivers

19   might not even be considered valid at all, meaning that there

20   are certain countries where extradition essentially is

21   non-waiveable and one has to go through a protocol that is set

22   forth, but there are literally dozens of regimes.

23        But I can say that we consulted the Office of

24   International Affairs, and their staff is not aware of any

25   country that would consider such a waiver binding; that it

K488LIMC

1    might be a factor that could be considered depending on the

2    country or might not be considered depending on the country,

3    but that it would not be binding, in the sense that as long as

4    Mr. Limberatos signed it now, wherever he went, we could easily

5    get him back if we were to locate him.  That is just simply

6    fiction and there are a number of cases that reference that

7    fact.

8              THE COURT:  Do you have any specific information about

9    Greece?

10             MR. SOBELMAN:  I don't, your Honor.  We weren't able

11   to get any specific information about Greece.  If the Court

12   wishes, we can follow up and attempt to do so.  But given the

13   blanket sort of categorical view of the Office of International

14   Affairs that there is no country that would necessarily honor

15   such a waiver, we didn't think it necessary.  In addition I

16   will note, as your Honor I am sure recalls from the earlier set

17   of hearings and briefings, Greece is under no obligation to

18   extradite its own citizens to the United States, and we are not

19   aware that this waiver would have any bearing.

20             THE COURT:  One moment.

21             Ms. Giniger, are you still on the line?

22             THE REPORTER:  Yes.

23             THE COURT:  Mr. Commissiong, are you still on the

24   line?

25             MR. COMMISSIONG:  I am still here, your Honor.

K488LIMC

| | |
|---|---|
| 1 | THE COURT:  It sounds like we have key players. |
| 2 | Ms. Harmon, are you still on the line? |
| 3 | MS. HARMON:  Yes, your Honor. |
| 4 | THE COURT:  Mr. Sobelman, would you continue, please. |
| 5 | MR. SOBELMAN:  I will simply say if the Court wishes |
| 6 | for us to try to obtain additional information, if it exists, |
| 7 | with respect to Greece's view on such a waiver, we can do so, |
| 8 | although, again, our understanding is that no country would |
| 9 | find it binding, and in any event, the United States government |
| 10 | would never be able to even request extradition of Mr. |
| 11 | Limberatos because of Greece's view they do not extradite their |
| 12 | own citizens pursuant to the terms of the treaty. |
| 13 | THE COURT:  Thank you.  I am not making that request |
| 14 | at this point. |
| 15 | MR. COMMISSIONG:  Pardon me, your Honor? |
| 16 | THE COURT:  I am not making that request of you at |
| 17 | this point. |
| 18 | MR. COMMISSIONG:  I wanted to briefly respond, if your |
| 19 | Honor would allow me. |
| 20 | THE COURT:  I'm sorry, Mr. Commissiong.  I didn't |
| 21 | realize that was your voice.  I was just responding to Mr. |
| 22 | Sobelman's offer, and I thought he had asked me a question. |
| 23 | If you will bear with me for a moment, Mr. |
| 24 | Commissiong, I just want to ask Officer Harmon, on behalf of |
| 25 | pretrial services, if she wanted to say anything at this point. |

K488LIMC

1          MS. HARMON:  Your Honor, I don't have anything to add,

2     unless you have any questions for me.

3          THE COURT:  No, I don't, but I wanted to make sure I

4     gave you the opportunity.  Thank you.

5          Mr. Commissiong.

6          MR. COMMISSIONG:  Yes.  Your Honor, I wanted to just

7     address a couple of points that the government made.

8          First, what does flight mean in this case at this

9     particular juncture?  If Mr. Limberatos were to flee to Greece,

10    what would he be fleeing to?  He would be fleeing from one

11    epicenter of this epidemic to another epicenter of this

12    epidemic, and he at worst would have to travel through a number

13    of countries that all have certain travel restrictions.  My

14    understanding is that from March 18 through April 18,

15    non-European Union citizens are barred from entering Greece;

16    transiting travelers, government delegation members, long-term

17    residents and spouses and minor children that are European

18    Union nationals are still permitted entry.

19         THE COURT:  But he is a Greece national, correct?

20         MR. COMMISSIONG:  He is a Greek national.

21         THE COURT:  So they let their own nationals back in?

22         MR. COMMISSIONG:  Well, will they let this particular

23    national back in?  I don't know, simply because travel

24    restrictions, based on how the epidemic is moving, are changing

25    daily.  The only person that he has in Greece is a 99-year-old

K488LIMC

mother.  So now, do we believe that Mr. Limberatos would leave

New York while this case is pending to go to Greece to

possibly -- travel on a plane, maybe traveling through a number

of countries, to possibly put his 99-year-old mother at risk?

I think that that's a question that we have got to consider.

And in terms of figuring out, well, what does flight mean in

this particular circumstance, do we believe that Mr.

Limberatos, under these circumstances, in this particular case,

as the case stands now, do we believe that he is a serious risk

of flight to the extent that flight means what I just

described?

        The government stated that testing at BOP facilities

is the same as testing in the general public, but BOP

facilities are not the same as the general public.  BOP

facilities are under the specific control of the federal

government, the federal government that has access to tests,

the federal government that runs facilities that are

particularly susceptible to extensive transmission of the

virus.  If the government says that through April 30 the public

in general should practice social distancing, that there is a

recommendation that people should wear masks, and the cramped

spaces of the Bureau of Prisons aren't a place where you can

social distance really with anyone, the crowded spaces of the

BOP, its staff haven't provided gloves or masks to their

inmates, then we are looking at a place that, contrary to the

K488LIMC

1    government's assertions, is susceptible, Mr. Limberatos being

2    over 50 is at a higher likelihood of contracting the disease,

3    and if he gets the disease, of dying, your Honor.

4            The government made some comments regarding additional

5    staff coming in to help field calls from counsel.  Additional

6    staff came in to the MCC shortly after Mr. Epstein's suicide.

7    That happened, to my understanding, because of staff shortages

8    prior to his suicide.  That staff remained there for just a few

9    weeks, and for a period of from January to about the time MCC

10   locked down because there was a weapon at the facility, the

11   wait times to see your client in person were inordinately long.

12   And that was because that staff couldn't stay for more than a

13   few weeks, on information and belief they couldn't stay for

14   more than a few weeks.

15           When the lockdown occurred in connection with the

16   firearm, counsel couldn't meet with defendants.  There was

17   limited access between the end of that lockdown and the

18   beginning of the March 13 lockdown in connection with the

19   coronavirus.  So when the government says that a couple of

20   weeks of limited access won't hurt, well, if you extend it back

21   to the lockdown in connection with the firearm, this is more

22   than a couple of weeks.  To say that it's just going to be a

23   couple of weeks, we don't know from day to day how this is

24   going to turn out.  And to assume, based on the BOP's record,

25   based on the MCC's record, that it's just going to be a couple

K488LIMC

1    of weeks, to me, that just doesn't make sense given these

2    circumstances.

3              I would also add that in terms of unsanitary

4    conditions and me sort of speculating, there has been for years

5    sentencing memoranda upon sentencing memoranda submitted by

6    defense counsel regarding infestation of mice and roaches at

7    the MCC and MDC.  I think as recent as November or December, in

8    the women's unit at the MCC, there was flooding; there was

9    flooding and the staff at MCC made the inmates clean up the

10   flooding.  Mold grew as a result of the flooding.  Those

11   unsanitary conditions are a fact; they are not speculation.  At

12   MDC, we know last February there was a small fire that

13   generated a lack of heat and hot water at that facility.  These

14   unsanitary conditions are not speculation, they are fact.  And

15   as a defense attorney who goes to these facilities, who has to

16   see clients in these facilities, I have seen corrections

17   officers with their own personal -- during good times -- with

18   their own personal bottle of hand sanitizer.  I myself wash my

19   hands right after I leave these facilities.  I have seen

20   unsanitary conditions in the bathroom, sometimes in the

21   visiting rooms --

22              THE COURT:  Mr. Commissiong.

23              MR. COMMISSIONG:  Yes, your Honor.

24              THE COURT:  I take your point and I am aware of the

25   long-term complaints of systemic problems.  And I don't say

K488LIMC

1    that those complaints are not insignificant.  They are

2    complaints that any of the 22 or 2300 people in these

3    facilities could make at this point, and they are institutional

4    systemic issues, and they go into the mix of whether there are

5    compelling circumstances here with respect to Mr. Limberatos.

6    And so that's a long-winded way of saying I take your point

7    about the general baseline level of sanitation being, as you

8    say, bad.  So you can go on.

9             MR. COMMISSIONG:  No, your Honor.  You were not

10   long-winded.  I think I was being long-winded and my apologies.

11   And that's all I have for now, your Honor.

12            THE COURT:  Thank you.

13            Anything further, Mr. Sobelman?

14            MR. SOBELMAN:  No, your Honor, unless there is

15   something specific that you would like us to address.

16            THE COURT:  Do you know anything about travel

17   restrictions that would legally prohibit Mr. Limberatos from

18   entering Greece?

19            MR. SOBELMAN:  No, your Honor, we don't.  It sounds

20   like from what Mr. Commissiong said, and I think your Honor

21   pointed out, Mr. Limberatos as a citizen would, of course, be

22   permitted to enter his country.  I don't know if he would have

23   some kind of quarantine requirement upon entering.

24            I would also note, in terms of Greece being, quote

25   unquote, an epicenter of the COVID-19 outbreak, it does not

K488LIMC

1      bear out in the numbers.  There are a total of 1800,

2      approximately, confirmed cases in Greece according to the

3      research I have conducted.  They have approximately 180 cases

4      per million citizens, as where the United States has about 1200

5      cases per million citizens.

6              Again, we really don't think it is necessary to create

7      a serious draw for the defendant to want to be there, given the

8      enormity of the sentence that he faces, the strength of the

9      evidence, and the other reasons that we set forth in prior

10     proceedings and this one that we think he is a substantial risk

11     of flight, but to the extent the Court is considering the state

12     of play in Greece with respect to COVID-19, we would just note

13     those statistics.

14             THE COURT:  Thank you.

15             Counsel, I have listened very carefully to everything

16     that has been said here today, and I have read very carefully

17     all of the prehearing submissions.

18             To the extent that Mr. Limberatos seeks general

19     reopening of the detention hearing pursuant to Title 18,

20     Section 3142(f) and reversal of the Court's prior determination

21     that no condition or combination of conditions can provide

22     adequate protection against the risk of flight, Mr. Limberatos

23     has the burden of demonstrating that there is new information

24     that has a material bearing on the issue of whether there are

25     conditions of release that will reasonably assure Mr.

K488LIMC

1    Limberatos's appearance as required.  See Section 3142(f).

2    Protection of the public was not an issue in the Court's prior

3    detention determination and is not argued here.  Under Section

4    3142(f), Mr. Limberatos has the burden of showing that there

5    are new facts that are material to the risks that are the focus

6    of the bail statute -- risk of flight and risk of danger to the

7    community.

8         Section 3142(i) provides that, where a detention order

9    has been previously issued under Section 3142(e), a judicial

10   officer may, by subsequent order, permit the temporary release

11   of the person in the custody of a United States marshal or

12   other appropriate person to the extent that the judicial

13   officer determines such release to be necessary for preparation

14   of the person's defense or for another compelling reason.  Mr.

15   Limberatos has the burden of showing that temporary release is

16   warranted under Section 3142(i).

17        In October, the Court found that Mr. Limberatos

18   presented a risk of flight against which no condition or

19   combination of conditions could provide appropriate protection.

20   This remains and is neither negated nor overcome by the health

21   risks that COVID-19 admittedly creates for all members of our

22   society, and especially for those detained in close quarters.

23   The operation of our criminal justice system and the rule of

24   law depend on successful management of personal and public

25   risks both in ordinary times and in times like these of

K488LIMC

emergency.  Mr. Limberatos has failed to demonstrate in this

application that there are conditions that can reasonably

protect against the risk of flight presented by his Greek

citizenship, the extradition policies of that country, and

evidence of his access to financial resources and false

identity documents, among other factors.

            The Court has previously found that supervision and

security bonds are insufficient to provide such protection, and

the defendant's proffers of an extradition waiver that is

likely unenforceable, a security package of higher monetary

value, and acceptance of home detention are insufficient to

mitigate the substantial risk of flight.  The Court

acknowledges that flight in this time of the COVID-19 pandemic

would itself present additional infection risks to Mr.

Limberatos, but as between the potential consequences of a

conviction and imposition of a penalty in this case and the

possibility of being able to reach Greece and be insulated from

those sorts of potential penalties, the Court is not persuaded

that it is unlikely that a rational person might take that

travel risk.

            The ability of the Court to provide supervision is

particularly challenged due to the public health emergency.  No

one in this city or country has absolute protection from the

risk of contracting this terrible disease while enforcement

officers and court supervision personnel are subjected to

K488LIMC

exposure risks as they go about their public duties, and of
course medical personnel are literally on the front lines.  The
Court does not take lightly the higher risk of exposure to the
disease present within the MCC than in a location in which the
person could be effectively and entirely separated from other
people or have access to the most effective cleaning products.
The BOP has, however, implemented policies and consulted with
appropriate experts to develop and implement strategies to
mitigate the risks posed by COVID-19 insofar as possible in the
context of its facilities' resources and mission.  The BOP's
mitigation measures do not and cannot eliminate completely the
risk of COVID-19, but these measures are calculated to mitigate
the risk of infection in its inherently close quarters for all
persons in custody and for BOP staff.

        Although in certain cases the specific medical
conditions of individual pretrial detainers may create risks so
substantial that they reduce or outweigh the risk of flight
posed by temporary release of such detainees, the Court finds
that in Mr. Limberatos's case, particularly given the Greek
extradition policies, the risk of flight presented by his
release outweighs the risk of exposure to COVID-19 that he
faces in detention, particularly where Mr. Limberatos is well
under the age of 65, although the Court accepts that other
public health authorities, including New York City, have
indicated that there is at least some elevated risk over the

K488LIMC

age of 50.  Mr. Limberatos also has not demonstrated that his

medical or physical condition makes him significantly more

vulnerable to the disease than other detainees.  Nor has Mr.

Limberatos shown that he is subject to a particular threat to

his ability ultimately to defend his case.

Therefore, the Court concludes that the COVID-19

pandemic does not present new facts material to Mr.

Limberatos's risk of flight under Section 3142(f) or a

compelling reason under Section 3142(i) sufficient to justify

his temporary release.  The constitutional objection that Mr.

Limberatos has raised to his continued detention is also

insufficient to meet the statutory standard as well as the

constitutional standard.

The next status conference in this case has been

adjourned in light of the current public health crisis and no

substantive proceedings are imminent.  And while the BOP has

temporarily barred legal visits at the MCC, telephone

privileges have been increased in light of the visiting

restrictions and the BOP and the Court are working on putting

in place facilities for video and teleconferencing with

counsel.  The government has proffered that the BOP will

continue to permit teleconferencing with counsel and access to

programs and services as permitted by the mitigation measures

being taken which include the 14-day medical quarantine of

detainees.

K488LIMC

1          This is a fluid and evolving situation.  This is

2     clearly a situation in which the early development of defense

3     strategies and attorney-client relationships is affected in a

4     negative manner by the restrictions that have been put in place

5     in response to the unprecedented, in our lifetimes, pandemic

6     conditions here in the city and worldwide, but at all levels of

7     government and society work is being done to mitigate the risks

8     and return to a more open and more accessible life for all.

9     And so in these emergency conditions, and given the relatively

10    limited period of time that these conditions are expected to

11    last, and the early stage of this case, the Court finds that

12    the current situation does not present a Sixth Amendment

13    violation or a compelling need for release to enable Mr.

14    Limberatos to prepare his defense.  Accordingly, Mr.

15    Limberatos's application for release is denied and the Court

16    will enter an order accordingly.

17         Mr. Commissiong, will you describe today's proceedings

18    to the defendant as soon as you can?

19         MR. COMMISSIONG:  Yes, I will do that, your Honor.

20         THE COURT:  And will you also order and provide a copy

21    of the transcript of these proceedings to Mr. Limberatos?  Of

22    course, I will sign off on the authorization for that.

23         MR. COMMISSIONG:  Yes.  Absolutely, your Honor.

24         THE COURT:  Thank you.

25         Counsel, I thank you for your advocacy and the level

K488LIMC

1    of seriousness with which you have both taken the issues

2    presented today and the questions of Mr. Limberatos's welfare.

3              MR. COMMISSIONG:  Thank you, your Honor.

4              THE COURT:  Is there anything else that we need to

5    take up together this afternoon?

6              MR. SOBELMAN:  Nothing from the government.

7              MR. COMMISSIONG:  Nothing from the defense, your

8    Honor.

9              THE COURT:  Thank you, everyone.  Keep safe and stay

10   well.

11             Thank you.  We are adjourned.

12             (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25