K541calc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                       19 Cr. 651 (LTS)

ALIN HANES CALUGARU,

              Defendant.         Bail Hearing
                                (Via Teleconference)
------------------------------x

                               New York, N.Y.
                               May 4, 2020
                               2:31 p.m.


Before:

                  HON. LAURA TAYLOR SWAIN,

                               District Judge


                    APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
SAMUEL P. ROTHSCHILD
ROBERT B. SOBELMAN
ELIZABETH A. HANFT
     Assistant United States Attorneys

JILL R. SHELLOW, ESQ.
     Attorney for Defendant


ALSO PRESENT:  MOHAMMED AHMED, U.S. Pretrial Services Officer

K541calc

```
1          (Case called)

2          THE COURT:  Good afternoon.  We're here on

3   Mr. Calugaru's application for release pursuant to Title 18 of

4   the United States Code Section 3145(c).  Mr. Hanes Calugaru has

5   been detained due to an order of this Court and seeks release

6   on conditions.

7          Counsel, would you please state your appearances,

8   beginning with the assistant United States attorneys.

9          MR. ROTHSCHILD:  Good afternoon, your Honor.  This is

10  Sam Rothschild for the government, and also on the line are

11  assistant United States attorneys Robert Sobelman and Liz

12  Hanft.

13          THE COURT:  Good afternoon, Mr. Rothschild,

14  Mr. Sobelman, and Ms. Hanft.

15          And counsel for Mr. Hanes Calugaru, Ms. Shellow?

16          MS. SHELLOW:  Good afternoon, your Honor.  This is

17  Jill Shellow on behalf of Mr. Hanes Calugaru.

18          THE COURT:  Good afternoon, Ms. Shellow.

19          And is the pretrial services officer on the line as

20  well, Officer Ahmed?

21          MR. AHMED:  Good afternoon, your Honor.  Mohammed

22  Ahmed.

23          THE COURT:  Good afternoon.

24          Is anyone else on the line other than court personnel?

25          If any members of the press or the public are on the
```

K541calc

1    line, please mute your lines.  And counsel, I'd be grateful if

2    you'd mute your lines when you expect to be silent for a period

3    of time.

4           And I remind everyone that neither recording nor any

5    retransmission of the proceeding is permitted.

6           I'll be calling on each speaker during these

7    proceedings.  When I do, please identify yourself by name for

8    clarity of the record.  And please don't interrupt each other

9    or me during the conference.  If we interrupt each other, it's

10   difficult to create an accurate transcript of the proceedings.

11   But having said that, I apologize in advance for breaking this

12   rule, as I may well interrupt counsel if I have questions.

13          I will give each of the attorneys an opportunity to

14   make additional comments or ask questions at the end of the

15   conference, but if anyone has any trouble hearing me or another

16   participant, please say something right away.

17          We are in the midst of the COVID-19 pandemic.  I'm

18   conducting this telephonic bail proceeding pursuant to the

19   authority provided by Section 15002 of the CARES Act and the

20   standing orders issued by our Chief Judge pursuant to that Act.

21   Videoconferencing is not reasonably available for today's

22   proceeding.

23          And Mr. Hanes Calugaru is participating in this

24   proceeding only through his counsel today.  Ms. Shellow has

25   represented in her application, at Docket Entry No. 239, that

K541calc

|   |   |
|---|---|
| 1 | Mr. Hanes Calugaru has consented to have this hearing pursued |
| 2 | telephonically in his absence, and I would just ask her at this |
| 3 | time to augment the record orally to make clear that Mr. Hanes |
| 4 | Calugaru was advised of his relevant rights, the basis of her |
| 5 | determination that he has knowingly and voluntarily given up |
| 6 | those rights, and whether it would have been feasible to obtain |
| 7 | a written confirmation from him of his waiver under the current |
| 8 | circumstances. |
| 9 | MS. SHELLOW:  This is Jill Shellow. |
| 10 | Your Honor, Mr. Hanes Calugaru was advised of his |
| 11 | right to participate and his right to participate |
| 12 | telephonically.  He understands that it is not possible for him |
| 13 | to participate physically in person and that we are proceeding |
| 14 | over a telephone conference call.  He understands what that |
| 15 | means.  He both knowingly and wilfully gives up his right to |
| 16 | participate, waives his right to participate in these |
| 17 | proceedings, and this was communicated to me through his |
| 18 | parents, who do not speak English, so it came from him to his |
| 19 | parents to a translator to me in the first instance, and in the |
| 20 | second instance it came to me in an otherwise privileged |
| 21 | conversation by email.  I can provide the redacted email if |
| 22 | your Honor would like an additional supplement to the record. |
| 23 | THE COURT:  Well, I will take your representation that |
| 24 | it is an email that also contains privileged information and I |
| 25 | won't require you to file the redacted version.  I am taking |

K541calc

1    that as an indication that without further work, we would not

2    have a cleanly worded specific document from Mr. Hanes

3    Calugaru, and so on the basis of Ms. Shellow's explanation, I

4    find that Mr. Hanes Calugaru has knowingly and voluntarily

5    waived his right to be present for this telephonic hearing and

6    that in the circumstances, it was not reasonably possible to

7    obtain a written waiver document directly from Mr. Hanes

8    Calugaru.

9              As I mentioned earlier, we are here to address the

10   application for release.  Mr. Hanes Calugaru has been detained

11   by order of this Court and seeks release on conditions pursuant

12   to Section 3145(c) of Title 18.

13             I have received and reviewed the pretrial services

14   report from the Southern District of Florida and the pretrial

15   services report addendum from the Southern District of New

16   York, which was produced on December 4, 2019.  I have also

17   received and reviewed the submission from defense counsel dated

18   April 20, 2020, and the government's submissions dated

19   April 22nd and April 27, 2020.

20             Are there any other written submissions that the

21   parties intend me to have considered in connection with this

22   hearing?

23             MR. ROTHSCHILD:  Nothing from the government, your

24   Honor.

25             MS. SHELLOW:  This is Ms. Shellow.  Nothing from the

K541calc

1    defendant.

2              THE COURT:   Mr. Hanes Calugaru seeks release, as I

3    said, pursuant to Section 3145(c), arguing that there are

4    exceptional reasons why his detention is not appropriate.   The

5    Court's view is that Section 3145(c) applies only to defendants

6    who are subject to detention pursuant to Title 18 of the United

7    States Code Section 3143(a)(2) or 3143(e)(2).   Those

8    subdivisions provide for the detention of defendants who have

9    been found guilty and are either awaiting imposition of a

10   sentence or have been sentenced and have filed an appeal.   That

11   is not the situation in which Mr. Hanes Calugaru stands today.

12   Accordingly, the Court believes that Section 3145(c) does not

13   apply and instead the Court intends to construe the motion as

14   it reflects that the Court reopen the bail determination

15   pursuant to Section 3142(f) to find that there are conditions

16   of release that will reasonably assure his appearance as

17   required by this case, taking into account the present COVID-19

18   situation.   The Court is also construing the motion to argue,

19   in the alternative, that the same facts constitute a compelling

20   reason for temporary release pursuant to Section 3142(i) of

21   Title 18.

22             Under Section 3142(f), Mr. Hanes Calugaru has the

23   burden of demonstrating that there is new information that has

24   a material bearing on the issue of whether there are conditions

25   of release that will reasonably assure his appearance as

K541calc

1   required.  Danger to the community was not previously argued by

2   the government, and I do not understand that to be an issue

3   now.

4           Similarly, under Section 3142(i), Mr. Hanes Calugaru

5   has the burden of showing that temporary release is necessary

6   for the compelling reason of his health.

7           And with that, I would invite Ms. Shellow to lead off

8   with her remarks.

9           MS. SHELLOW:  Thank you, your Honor.  This is

10  Ms. Shellow.

11          And thank you for construing the motion under

12  Section 3142.  That was clearly an error on my part, and your

13  Honor has accurately articulated the statutory provisions that

14  I would have cited had I correctly cited the statute.

15          Our position is that the global pandemic, COVID-19, is

16  in fact new information that was not available at the time that

17  your Honor ruled, and in fact was not available even at the

18  time that the Court of Appeals considered the appeal in this

19  matter.  We also take the position that not only does the virus

20  itself but the Bureau of Prisons and specifically MDC's ability

21  to protect Mr. Hanes from the virus is insufficient and puts

22  him at significant risk of both getting the disease and

23  transmitting it to others within the MDC community.

24          I'm not, unless your Honor has questions, going to go

25  into the nature of COVID-19 or why it is new information or why

K541calc

1    it is compelling, unless your Honor would like me to do so.

2         I will note that in the alternative to releasing

3    Mr. Hanes Calugaru on terms --

4         THE COURT:  Hold on.  I heard a beep.  Did someone

5    just join us?

6         MR. LEE:  Yes.  Matthew Russell Lee from Inner City

7    Press.

8         THE COURT:  Thank you.  Good afternoon.

9         Ms. Shellow, would you continue.

10        MS. SHELLOW:  Yes.  We would request, in the

11   alternative, that your Honor would consider, under 3142(i), a

12   temporary release on conditions that would expire when the

13   court returns to normal operations or would be reviewable by

14   your Honor at such time.  So it is a slight twist to the

15   request for release.

16        I'm going to, if I may, your Honor, address the

17   government's arguments going backward -- that is to say, from

18   its submission on the 22nd.  I am not going to address its

19   evidence; I'm not going to address your Honor's previous ruling

20   except to the extent it relates to my argument.  Nothing has

21   changed since your Honor's original ruling in that matter.

22        The key to the 3142 argument is in part the ability,

23   or lack of ability, of MDC to care for and manage the prison

24   population and prevent the spread of COVID-19.  Your Honor, in

25   *United States v. Smalls*, at 2020 WL 1866034, April 14th of

K541calc

1    this year, remarked that BOP measures are calculated to

2    mitigate the risk of infection in its inherently close

3    quarters, for all persons in custody and BOP staff.  In certain

4    cases, specific medical conditions may create risks so very

5    substantial that they reduce or outweigh the safety risks posed

6    by temporary release of such detainees.

7            Your Honor, on April 30th of this year, in

8    litigation in the Eastern District of New York, counsel on

9    behalf of inmates who are suing the warden of MDC in *Chunn v.*

10   *Edge*, 20 Civ. 1590, submitted an evaluation of MDC's ability to

11   implement procedures that are consistent with the directives of

12   the Centers for Disease Control.  Their declaration, or the

13   declaration of their expert, is approximately 22 pages long,

14   and I do not intend to go into its detail.

15           THE COURT:  I'm aware of it.

16           MS. SHELLOW:  Your Honor, you're aware of the

17   declaration?

18           THE COURT:  Of the affidavit, yes, I am.

19           MS. SHELLOW:  Of the affidavit.  Okay.  And I'm going

20   to rely on that analysis of MDC's current ability, or, as the

21   case may be, inability, to both identify patients who are ill

22   with the virus and prevent its spread and provide care and

23   protection to those who are at risk.

24           THE COURT:  Ms. Shellow, I have notice provisions for

25   you to make a surreply submission in advance of today's

K541calc

1    proceedings.  It is now Monday afternoon, the 4th of May.  That

2    affidavit or declaration was filed on the 30th of April, and

3    you clearly had time to review and formulate an argument based

4    upon it.  Is there a particular reason why you neither notified

5    the Court nor, I would imagine, the government in advance of

6    your intention to rely on this as an additional factual

7    proffer?

8           MS. SHELLOW:  Your Honor, I actually did not become

9    aware of it until after the deadline for filing a reply and was

10   uncertain how I was going to use it.  I debated whether to ask

11   for additional time, but having once already done so and in

12   light of the government's response to your Honor that my client

13   is not in a high risk category, I decided that it would be

14   unnecessary.  I'm willing to certainly put off today's

15   proceedings.  I presume the government has now seen this

16   affidavit or declaration, and if not, I am certainly willing to

17   provide a copy of it.

18          THE COURT:  Well, as we will all encounter each other

19   in court on this and other matters going forward, Ms. Shellow,

20   I'll just say that in the future, once you have made a decision

21   to bring in something new that is at least substantial in

22   volume, and I will leave the question of the weight of it in

23   these proceedings until after I have heard the arguments of

24   both counsel and have had the opportunity to reflect on them,

25   but when you do intend to introduce something substantial that

K541calc

1     was not raised or discussed in written submissions, I would

2     expect that you would give the Court and opposing counsel some

3     notice whether or not you ask for an adjournment.  The deadline

4     had been last Friday at noon, and there's been lots of time

5     between now and then to file something, and so we will go ahead

6     today.  I will hear your remarks, I will hear the government's

7     response, and any reply, and if there is a request for an

8     opportunity to make a further submission or for some other

9     adjustment in our schedule, I will certainly consider that.

10    But I still have trouble seeing any proper reason why there was

11    not even some sort of letter or notice dropped on the docket

12    this morning to direct our attention to this material.  I read

13    the newspaper this morning so I'm aware of it, but I shouldn't

14    have to assume that anything I read in the newspaper will

15    become the centerpiece of an argument that I'm hearing three

16    hours later, unless counsel has told me that it will.

17             MS. SHELLOW:  I apologize, your Honor, as I should

18    have in fact informed the Court and opposing counsel.  I will

19    never make that error again.

20             THE COURT:  Thank you.  Please go on.

21             MS. SHELLOW:  I believe that that addresses the phases

22    1 through 5 of the BOP's attempt to manage COVID-19 within its

23    facility.  The Bureau of Prisons, as I noted in my initial

24    submission, for MDC and MCC, is providing statistics, not only

25    on its website but to Chief Judge Mauskopf in the Eastern

K541calc

1    District of New York.  The most recent of those was last

2    Thursday.  They are published on the court's website.  These

3    are the same statistics that were cited in my letter with the

4    URL for the report.  As of April 30th, at MDC, Judge Mauskopf

5    was informed that 13 inmates had been tested; six inmates had

6    tested positive.  And 32 staff had tested positive.  It's for

7    another day, no doubt, that the Bureau of Prisons reports on

8    its own website different statistics.  The Bureau of Prisons

9    daily publishes statistics for those facilities where there are

10   reported cases of COVID-19, and it updates them every day, I

11   believe, except Saturday, or except Sunday.  The most recent of

12   those says that at the Brooklyn facility, there were two

13   inmates who tested positive, no staff who tested positive, no

14   inmates and no staff who have died from the virus.

15            Judge Rakoff, in the transcript that your Honor was

16   provided by the government, acknowledged that the virus is an

17   exceptional circumstance, and other judges have acknowledged

18   that the rate of growth in the Bureau of Prisons, and in prison

19   facilities generally, of the virus is exponential and that

20   along with residents of nursing homes, residents of

21   correctional facilities, where inmates lack the ability to

22   social distance, as now required, where they lack access to

23   cleaning solutions and soap and gloves and masks, are a petri

24   dish for the spread of the virus.

25            Mr. Hanes appeared, as the government acknowledged, on

K541calc

1    the list that the MDC I think in fact provided to Judge McMahon

2    of people who were considered high risk at the beginning of

3    this pandemic.  The government represents that MDC counsel said

4    that he isn't on the current high risk list and submitted to

5    your Honor a statement that MDC doesn't share that list.  The

6    government, however, failed to address how this list, meaning

7    the second list -- or even the first list, for that matter --

8    were created; that is to say beyond just the general risks for

9    COVID-19 as published by the CDC, there must have been other

10   criteria that were used to develop both the first list and the

11   second list, and it's unclear whether any medical personnel at

12   all were involved in the creation of either list.  Unless the

13   government has submitted something *in camera* to your Honor with

14   the list or explaining how the list has come to be, I think it

15   is fair to say that if the Bureau of Prisons, MDC is not going

16   to release information about how it prepared the list and who

17   is on it, that your Honor should view it with significant

18   skepticism.  All I am aware of is that Mr. Hanes was on the

19   first list, however that was created, and the government

20   concurs that he was on that list.  I don't particularly know

21   what it means.  I will tell you that the government, on the

22   same day that it filed its response, also provided me with

23   Mr. Hanes's medical records, which I in fact had received

24   earlier as a result of the subpoena.  The medical records do

25   establish that he is what is considered prediabetic and that he

K541calc

|    |    |
|----|----|
| 1  | is taking a statin for a high cholesterol count.  There is in |
| 2  | the medical literature some significant disagreement about the |
| 3  | extent to which high cholesterol or prediabetes, for that |
| 4  | matter, are impacted by COVID-19.  I would submit to your Honor |
| 5  | that in the approximately 16 days since your Honor wrote the |
| 6  | *Smalls* decision that our knowledge base has grown significantly |
| 7  | about the virus and that we can hopefully look forward to |
| 8  | significantly more information about both how to manage it as |
| 9  | well as what its risk factors are, but that that information is |
| 10 | changing daily. |
| 11 | The question that I posed generally and that I pose |
| 12 | for your Honor is whether your Honor's analysis or -- |
| 13 | THE COURT:  Are you still there? |
| 14 | MS. SHELLOW:  Hello?  I heard something. |
| 15 | THE COURT:  Ms. Shellow? |
| 16 | MS. SHELLOW:  Yes.  Can you hear me? |
| 17 | THE COURT:  Ms. Shellow? |
| 18 | MS. SHELLOW:  Can you hear me? |
| 19 | THE COURT:  Can anyone hear me? |
| 20 | MS. SHELLOW:  I can hear your Honor.  I -- |
| 21 | THE COURT:  I seem to have lost the sound on this |
| 22 | line.  So I am going to text Lisa. |
| 23 | THE DEPUTY CLERK:  Judge?  Hello? |
| 24 | MR. ROTHSCHILD:  Your Honor, this is Sam Rothschild |
| 25 | speaking.  Can you hear me? |

K541calc

1          Jill, for what it's worth, I've been able to hear you

2     the whole time.

3          MS. SHELLOW:  Okay.  I can hear you, and I could hear

4     the judge, and --

5          THE COURT:  I'm going to call back in now.

6          MS. SHELLOW:  And Lisa -- Lisa, can you hear me?

7          THE DEPUTY CLERK:  Yes, I can hear you.  Let me lower

8     the mic.

9          She said she'll dial back in, so hopefully she can

10    hear everybody.

11          (Pause)

12          THE COURT:  All right.  I don't know what AT&T did,

13    but it shut me out of the call, so I apologize for that delay.

14          Ms. Shellow, the last thing I heard you say was:  And

15    so this is the question posed for the Court.  And then I heard

16    nothing.

17          MS. SHELLOW:  I guess it was a convenient breaking

18    point.

19          The question posed for the Court is whether your

20    Honor's analysis of the risk of flight is altered in the new

21    universe that we are living in.  Some courts have observed that

22    flight would be -- I'm going to quote -- "would be enormously

23    more risky and complicated in light of the travel and

24    commercial restrictions brought on by COVID-19."  That comes

25    from *United States v. Fellela*, 2020 WL 1457877, from the

K541calc

1    District of Connecticut on March 20*th*, cited by Judge Cott in

2    our district in *United States v. Lopez*, a different Mr. Lopez

3    defendant than the Lopez who appeared before Judge Rakoff and

4    who is the subject of the transcript in Exhibit A of the

5    government's submission.  The opinion by Judge Cott is in

6    19 Cr. 116, in which he found that the defendant could be

7    released, and he remarked on how difficult it would be for the

8    defendant to flee in light of COVID-19.  I will note for your

9    Honor that Judge Wood, who is the district court judge who was

10   assigned to this Mr. Lopez's case, did reverse Judge Cott, but

11   not on the risk of flight; she reversed him on the risk of

12   dangerousness.

13        In terms of flight, not only is there now COVID-19,

14   but it appears that at least both in this district and in the

15   Southern District of Florida, according to statistics that I

16   obtained literally half an hour before this call and that are

17   available not to the public generally but I believe available

18   through the court's VPN, which is accessible I believe to your

19   Honor and to the government and to the Federal Defenders -- I

20   do not have access to that VPN so I will email your Honor the

21   table that I am reading from -- it's a table of pretrial

22   services violations for the 12 months ending December 31, 2019.

23   In the Southern District of New York, of the 1914 defendants

24   released on pretrial conditions, 29 of them were violated for

25   failure to appear.

K541calc

1        In addition, because Mr. Calugaru proposes that his

2   supervision would probably be handled -- and I can't speak on

3   behalf of pretrial services, but -- likely would be handled in

4   conjunction with the Southern District of Florida, the Southern

5   District of Florida's statistics say that apparently --

6        THE COURT:  Oh, no.  I am not hearing again.  The

7   voice just cut off.

8        For what it's worth, Ms. Shellow has been sort of

9   choppy through this call for me.  Can you hear me now?

10        THE DEPUTY CLERK:  Judge, do you hear me?

11        THE COURT:  Ms. Ng, if you can hear me, would you

12   please call back through again on this same line.

13        MS. SHELLOW:  Lisa, I can hear you.  I can hear the

14   judge.

15        THE DEPUTY CLERK:  Okay.  Everybody hears me, right?

16        MR. ROTHSCHILD:  Yes, Lisa.  This is Sam.  We can hear

17   you.

18        THE DEPUTY CLERK:  Okay.

19        MR. AHMED:  Yes, this is Mohammed.  I can hear you on

20   this end.

21        THE DEPUTY CLERK:  Let me get her back.

22        (Pause)

23        THE COURT:  All right.  I don't know what is going on,

24   but again, I lost Ms. Shellow in mid-word.  She was I think

25   going into Florida pretrial violation statistics.

K541calc

```
 1            MS. SHELLOW:  Your Honor, I have a question in light

 2   of the technological issues that we are having this afternoon.

 3   And I think what I heard your Honor say was that my

 4   presentation has been choppy throughout.

 5            THE COURT:  I hear you, but it's a little bit

 6   distorted.

 7            MS. SHELLOW:  In light of that, and in light of my

 8   reliance on Dr. Venters's affidavit, does it make sense for us

 9   to adjourn to another time that is convenient for your Honor

10   and perhaps when there will be fewer technological issues?

11            THE COURT:  One can only hope with respect to the

12   technological issues.

13            But would the government like further time to reflect

14   and perhaps make a supplemental submission before we adjourn?

15   I'll see what the government's request is here.

16            MR. ROTHSCHILD:  Yes, your Honor.  This is Sam

17   Rothschild.

18            We'd defer to the Court on whether an adjournment is

19   appropriate or necessary here.  I'm happy to respond to the

20   points that Ms. Shellow has made on the call thus far.  I think

21   my presentation would be relatively brief and would rely

22   largely on what's already been said in our submissions, so the

23   government is happy to move forward with this today, if your

24   Honor is so inclined.

25            THE COURT:  All right.  Let's try again, but I've been
```

K541calc

1    having trouble with the AT&T bridge, or at least my ability to

2    go into it today, and I also have another conference at 4.  So

3    if we move this one again, let me just ask Ms. Ng:  Ms. Ng,

4    would you be available to resume at 11 tomorrow?  I know you

5    have an earlier meeting.

6              THE DEPUTY CLERK:  Yes, Judge, I would be able to.

7              THE COURT:  All right.  So if I start saying I can't

8    hear anybody again and everybody else can hear me, then we'll

9    all adjourn, we'll resume at 11 tomorrow, and we will put in an

10   order giving a security code for tomorrow.  Does that time work

11   for everybody else?

12             MR. ROTHSCHILD:  That works for the government, your

13   Honor.

14             MS. SHELLOW:  That works for me, your Honor.  This is

15   Ms. Shellow.

16             THE COURT:  Pretrial?

17             MR. AHMED:  Mohammed Ahmed.  It works for pretrial as

18   well.

19             THE COURT:  Okay.  Thank you so much.  So let's keep

20   our --

21             THE DEPUTY CLERK:  Judge?

22             THE COURT:  Yes.

23             THE DEPUTY CLERK:  We can just use the same security

24   code for tomorrow's conference.  That's fine.

25             THE COURT:  Okay.  Fine.  So if we need to dial back

K541calc

1    in tomorrow at 11, we'll use the same security code, and I

2    won't --

3                THE DEPUTY CLERK:  Yes, the same numbers for today.

4                THE COURT:  So I won't put in a further order.

5                Ms. Shellow, I have my ears open and my fingers

6    crossed.  Please continue.

7                MS. SHELLOW:  Thank you, your Honor.

8                I was in fact starting the failure to appear

9    statistics from the Southern District of Florida.  The number

10   of cases -- that is, the number of defendants who are released

11   in that district -- is comparable to the Southern District of

12   New York, approximately.  It's 1319 cases, and of those, only

13   two were failures to appear.  So I believe that at least as far

14   as pretrial services records of being able to control the

15   defendants who are released and the record of the defendants

16   who in fact are released, it minimizes or is at least a factor

17   that your Honor should consider in determining whether, in

18   these times, in these circumstances, Mr. Hanes is likely to

19   flee.

20               It goes without saying that there is probably no place

21   in the world that Mr. Hanes could go where he would not be at

22   risk of COVID-19.  He is at greater risk in a confined

23   community setting like the MDC, and there should be no question

24   of that.  If he can be spared the probability of contracting

25   the virus and the possibility that asymptomatically he passes

K541calc

1     it on to someone else or other people at the MDC, then I would

2     request that your Honor release him on the terms that we have

3     outlined in our original proposal.  Access to money has a

4     different meaning when there's nowhere you can go to spend it.

5     Similarly, access to encrypted conversations, when there is no

6     one to have them with, requires a different lens, I would

7     submit.

8            Mr. Hanes would live on a home incarceration basis, or

9     whatever constraints your Honor would impose in terms of his

10    living conditions.  He would be quarantined for the first 14

11    days pursuant to the BOP's protocols and, for that matter,

12    consistent with prudent public health practice.  He would not

13    be permitted to have access to anyone that he could infect.

14           I struggle because I know that your Honor, when you

15    evaluated our arguments the first time around, was unimpressed

16    with my client's ability to conform his conduct to the law.  I

17    submit that this is (a) a different circumstance, and (b) this

18    is a white collar type case; that is to say, as the government

19    recognizes, this is not a case where the defendant is accused

20    of any kind of violent crime.  His crime was committed in

21    person, using an ATM machine; that is to say, he physically had

22    to go to a machine, and the government has proffered

23    photographs of a person it claims is my client at those

24    machines.  Home incarceration would clearly prevent him from

25    being able to continue any of the criminal conduct with which

K541calc

1   he is charged.

2          Similarly, there is no place internationally that he

3   could fly at the moment, and until those kinds of restrictions

4   are lifted, I submit that your Honor should at least

5   temporarily release him from BOP custody so that he has a

6   better chance of staying healthy.  BOP will do a better job of

7   protecting those who remain because clearly there are

8   defendants for whom release is wholly inappropriate.  And BOP

9   is charged with, and the MDC is charged with, protecting

10  everyone, not only in its custody but on its staff, and to the

11  extent that one less person at MDC makes that job just a little

12  easier, I submit that it makes sense from a public health point

13  of view, it makes sense from the perspective of my client --

14  that is, while he is subject to a potentially lengthy sentence,

15  this is not a capital case.  He shouldn't have to face the

16  possibility of dying.  And any one of us -- he perhaps more so

17  than others because of his health conditions, me because of my

18  age -- any of us could be struck down and will die from this.

19  This is not a virus to be taken lightly.  It kills not only

20  people who are old but people who are young.  It kills not only

21  people who are sick but people who were healthy before they

22  contracted it.  And if we can do something to prevent his

23  contracting the virus, then I believe that we should do so.

24  And I believe it is possible to fashion a series of conditions

25  that will be sufficient to ensure his return to court when your

K541calc

1    Honor orders him to do so, whether that is by telephone or in

2    person.

3            I think that's all I have to say, your Honor.

4            THE COURT:  Thank you, Ms. Shellow.

5            Am I correct in understanding then that you are not

6    going to make any further specific proffers as to Mr. Hanes's

7    individual medical condition?

8            MS. SHELLOW:  As I stated in my original submission,

9    he has high cholesterol that is documented in his medical

10   records, which were provided to me pursuant to a subpoena and

11   which the government has a copy of.  He similarly has been

12   described as prediabetic, and that merely -- as I understand

13   it, that refers to his susceptibility to diabetes; and the high

14   blood pressure, which I believe, but I did not see the original

15   list, so I do not know the criteria that were used to place him

16   on the list originally, but his private physician, I am told,

17   diagnosed both high cholesterol and high blood pressure at the

18   time that he was last seen in Florida.  I have been unable to

19   obtain those records because I am unable to obtain a HIPAA

20   release from my client under the pending circumstances.  But I

21   have reason to believe that that's what they say as there is a

22   reference in the BOP's records to hypertension and then they

23   say resolved, which suggests that at one point in time it did

24   exist and then it was resolved.

25           THE COURT:  I will just note for the record and

K541calc

1   thereby share with you all that I have looked at the CDC list

2   of risk factors.  That includes what the CDC characterizes as

3   serious heart conditions, a subset of which is pulmonary

4   hypertension, which is, as I understand it, a type of high

5   blood pressure that affects the arteries in the lungs, as a

6   potential aggravating factor for the respiratory symptoms of

7   COVID-19, but in my review, I did not see that high blood

8   pressure in and of itself is a risk factor -- a higher risk

9   factor specifically identified on the CDC list, at least as of

10   last week when I looked at it.

11          And so with that, unless Ms. Shellow wishes to say

12   anything further, I would ask that Mr. Rothschild or one of his

13   colleagues step in now.

14          MR. ROTHSCHILD:  Thank you, your Honor.  This is

15   Mr. Rothschild.  And as I noted, your Honor, I will try to be

16   brief.

17          I'd like to address what Ms. Shellow said that

18   pertains to the relevant factors under the law and that

19   pertains to this defendant in particular, because I believe

20   much of what she said could apply to all prisoners in all jails

21   everywhere, and so I want to focus on the specific facts here.

22          I won't belabor the point that the factors that caused

23   your Honor to conclude that this defendant poses a serious

24   flight risk are all still present today.  Prior to today's oral

25   argument, I hadn't understood defense to be contesting that.

K541calc

1    Nothing in the submissions alluded to a decreased risk of

2    flight.

3              I do understand Ms. Shellow now to be arguing that in

4    light of COVID, flight is somehow harder.  And just to take

5    that up briefly, as your Honor well knows, flight doesn't just

6    mean hopping on an airplane, although I would dispute

7    Ms. Shellow's representation that the defendant would not be

8    able to get on a flight.  In fact, my understanding is that

9    citizens of the European Union, which this defendant is, are

10   still free to fly to the European Union, and there are flights

11   available, so that risk is still present.

12             Ms. Shellow said that there's no place where the

13   defendant could go where he'd be free of the risk of COVID-19,

14   and that may well be true.  There are, however, lots of places

15   where he could go where he'd be free of the risk of this

16   pending criminal case, and that's why we're here.

17             As far as some of the other factors that Ms. Shellow

18   argued are deserving of less weight now, I submit that there's

19   plenty that this defendant could do with his access to cash,

20   plenty of individuals with whom he could continue to have

21   encrypted conversations, so I don't really understand how the

22   presence of the COVID-19 pandemic really decreases the ability

23   of this defendant to evade law enforcement detection and evade

24   the charges in this case.

25             Turning to the risks that COVID-19 presents to this

K541calc

```
 1    particular defendant, your Honor is exactly right.  The general

 2    high blood pressure is not on the CDC's list of underlying

 3    conditions that pose an increased risk, nor are prediabetes or

 4    high cholesterol, so none of the three conditions that defense

 5    relies upon put this defendant into the category of high-risk

 6    individuals with respect to COVID-19.  And so the Court can

 7    look at the cases that were cited on page 6 of the government's

 8    opposition, where courts, including this Court, have denied

 9    release for even those defendants who do have more serious

10    versions of some of the conditions that this defendant cites,

11    such as diabetes, as opposed to prediabetes.

12           Ms. Shellow relied on the *Smalls* case, which is cited

13    in our brief, where your Honor denied release, and Ms. Shellow

14    argued that in the 16 days since the *Smalls* case, much has

15    changed.  I think of relevance, though, in the 16 days since

16    the *Smalls* case, his three conditions are still not on the

17    CDC's list of high-risk underlying conditions.

18           Similarly, Ms. Shellow invoked Judge Rakoff's

19    decision, the transcript of which we attached to our

20    submission.  Again, as we noted in our brief, the important

21    point there is that Judge Rakoff found, among other things,

22    that that defendant did not pose a risk of flight.  That

23    defendant had been out pending his guilty plea and had abided

24    by conditions.  So clearly that case is not on all fours here.

25           I'm happy to answer any questions that your Honor may
```

K541calc

have with respect to the high risk list put out by MDC.  I note
that defense apparently seems to rely on that list in her
arguments, so if your Honor would like, I'd be happy to speak
about that list, but otherwise, your Honor, we'd rest on our
submission and respectfully request that your Honor deny the
motion for reconsideration.

THE COURT:  Well, there doesn't seem to be particular
reliance on the list one way or the other.  She had discussed
the CDC criteria.  If the government is not relying on absence
from the list, I don't think I have any further questions for
you about that.

Do you have any argument for me in terms of
contextualizing the argument that I think I hear Ms. Shellow
making, at least in a qualified way, that the affidavit that
was filed in the Eastern District case shows that the risk in
general to all detainees is not what the Bureau of Prisons may
be aiming for and is unacceptably high?  Although Ms. Shellow
does seem to accept the notion that not everyone should be
released because of whatever risk level is indicated by this
affidavit but that notwithstanding the BOP's five phases, this
affidavit should cause me to see differently the general status
of BOP's mitigation efforts.  So do you have anything to say
about that?

MR. ROTHSCHILD:  Thank you, your Honor.  This is Sam
Rothschild.

K541calc

1           Unfortunately, your Honor, I don't have much to say to

2    that.  And I've conferred with my two colleagues who are on the

3    line.  The three of us were generally aware of the litigation

4    in which that affidavit was apparently filed, but prior to

5    Ms. Shellow's invoking it, none of us has looked at or read

6    that affidavit.  However, I will say that to the extent that

7    the kind of argumentative move being done with the affidavit is

8    to kind of cast doubt on BOP or MDC's handling of this crisis

9    generally, I think that the point that your Honor was alluding

10   to is exactly right, which is to say that these applications

11   for pretrial release continue to require individual analysis,

12   you know, defendant by defendant, and there's simply nothing in

13   the defense's submissions here that would distinguish this

14   defendant from any other.

15           THE COURT:  Thank you.

16           Officer Ahmed, did you wish to say anything from the

17   perspective of pretrial services?

18           MR. AHMED:  Yes, your Honor.  Mohammed Ahmed.

19           I would like to point out two general things.  One, we

20   continue to believe that there are no conditions or combination

21   of conditions that would reasonably assure the appearance of

22   the defendant.

23           I would like to note that our agency has really gone

24   from being a proactive agency to being more reactive.  I would

25   also note that the location monitoring program is primarily

K541calc

1    used to address danger, dangerousness to the community and not

2    for risk of flight.  There's nothing barring someone from

3    cutting off their ankle monitor and leaving, and in that case,

4    given this pandemic, the reaction of pretrial services is

5    extremely limited.

6         Nothing else.  If your Honor has any questions, I'd be

7    happy to answer them.

8         THE COURT:  Would I be reasonable in assuming, as to

9    the statistics that have been cited, that persons who have been

10   subjected to monitoring by the Southern District of New York

11   and Southern District of Florida would be people who have been

12   determined by a court, in light of the advice of pretrial

13   services, to pose a low risk of flight in the first place?

14        MR. AHMED:  I don't know the exact statistics, but I

15   would agree that it would be more so to address danger and not

16   the risk of flight.  Again, our operations are limited, and

17   this program as is, even when we are fully staffed and

18   operational, it's not used to primarily address the risk of

19   flight.

20        I would also note, I don't know what Florida

21   operations are like now, but the last time I spent -- I did a

22   case where we sent someone to Georgia, and at that point, based

23   on people that we were requesting courtesy supervision from New

24   York, they were asking that the people not go to the

25   courthouse, they were asking that they, you know, go to a

K541calc

1   residence.  And they were not fitting them with location

2   monitoring equipment.  They were not having any personal

3   contact with people.  And that was a case in, if I recall

4   correctly, the Middle District of Georgia, and I believe that

5   that might be similar to what's going on throughout the country

6   as well.

7              THE COURT:  Thank you, Officer Ahmed.

8              MR. AHMED:  You're welcome, ma'am.

9              THE COURT:  Ms. Shellow, any reply remarks?

10             MS. SHELLOW:  Briefly, your Honor.

11             In response to pretrial services, I think it is not

12   possible to generalize from the Northern District of Georgia to

13   the Southern District of Florida.  At least in our district,

14   according to Mr. Rothman, if a defendant is being released with

15   home incarceration, they are getting the bracelet either put on

16   the same day or the next morning, depending on when they are

17   released and where they are released from.  So at least in this

18   district, we are in fact fitting people with bracelets.

19             As to whether the bracelet's primary function is to

20   deter violence or to deter flight, I would argue that while it

21   may be, in this officer's view, primarily used to address the

22   risk of violence, it certainly operates to address the risk of

23   flight because the rate at which defendants -- defendants can't

24   be released under the law if there is either a risk of danger

25   or a risk of flight, so by virtue of the fact that they are

K541calc

1   being released and put on some form of location monitoring,

2   that means that someone has made the assessment that they can

3   conform their conduct to the requirements of the bracelet and

4   that in very few instances do they in fact cut the bracelet

5   off, or otherwise attempt to damage or to evade its

6   surveillance forms.

7          As to reliance on the list created by BOP, I am

8   relying on the first one, on the first list, only insofar as

9   that was the judgment of the Bureau of Prisons that my client

10  was at a particular risk.  I do not know how they arrived at

11  that conclusion, but that was in fact the conclusion of the

12  MDC.  That is my understanding of what that first list was.  I

13  do not have any information, as I said, about the second list,

14  and the significance of his absence from the second list.

15         The government suggested that none of the factors

16  related to risk of flight had been in any way diminished.  In

17  point of fact, Mr. Hanes no longer has documents that would

18  allow him to leave the country, and under the present

19  circumstances, if required to be on home incarceration, would

20  not have access to those documents, even if he could find

21  someone who could somehow make them for him.

22         Your Honor has the ability to fashion, should you

23  desire, a condition that would prevent him from using a

24  cellphone and would prevent him from --

25         THE COURT:  Pardon me.  I could fashion a condition

K541calc

that would prohibit him from using a cellphone and that would

prohibit him from having various forms of contact or

association, but one of Officer Ahmed's points was that the

ability of a pretrial services department to proactively

enforce those prohibitions is limited in normal times, and even

more so now, given the general risks even to officers.

MS. SHELLOW:  Your Honor, the enforcement of any of

the imposed prohibitions primarily would come from the

suretors -- that is, those people, his parents, who are not

only willing to put up the cash that they were able to have and

find, which was a significant hardship, but also whatever

earnings they're likely to have.  The amount of money the bond

suggested is sufficiently onerous that his parents would ensure

that my client abides by whatever prohibitions your Honor

imposes because his failure to do so would mean that they are

in financial ruin.  As it is, you know, his father is, as I

understand it, working only one or two days a week, and in the

construction business in Florida.  Even in a family business,

he's only working one or two days a week.  So I think that

that's where the enforcement comes from.  And in large measure,

in any case where a bond amount is set and financially

responsible people agree to forfeit to the United States

government a sum certain if the defendant does not adhere to

the prohibitions of the Court, that's the *in terrorem* effect

that pretrial services, at least at the moment -- or I can't

K541calc

1    speak to its ordinary operations, but at the moment is unable

2    to provide the sufficient attention to that it would like.

3           THE COURT:  And a package with suretors was offered on

4    the initial bail application, correct?

5           MS. SHELLOW:  That is correct, and it is offered

6    again.

7           THE COURT:  Thank you.

8           I have considered carefully the submissions in advance

9    of this hearing, and I've listened carefully to everything that

10   has been said today, and as I noted, I am familiar with the

11   affidavit or affirmation to which Ms. Shellow referred when she

12   was making arguments regarding conditions at the MDC and the

13   ability of the Bureau of Prisons in general and the MDC in

14   particular to mitigate the risks of COVID-19 contagion.

15          Insofar as this is an application to reopen the

16   earlier bail hearing, Section 3142(f) of Title 18 permits the

17   Court to reopen a bail hearing if the defendant demonstrates

18   that there are new facts that are material to the determination

19   that are the focus of the bail statute -- risk of flight and

20   danger to the community.  Here, risk of flight is the key

21   consideration.

22          Mr. Hanes proffers that the COVID-19 pandemic is a

23   fact that was not known at the time of his bail hearing and

24   argues that because of the worldwide pandemic, there is no

25   place in the world that he could or would flee if released

K541calc

because he would not be safe from a potentially lethal

infection anywhere other than in the home of his parents.  And

Mr. Hanes also makes arguments as to conditions at the MDC.

        And so the fact of the COVID-19 pandemic and that the

MDC is responding to it in various ways are certainly true for

every detainee at the MDC.

        The argument that the combination of Mr. Hanes's

medical condition, which includes certain conditions that are

not CDC-recognized risk factors in and of themselves but are

diagnosed medical conditions, the combination of those and the

pandemic, he argues, creates a fear of infection that is

sufficient to ensure that he remains in the home to which the

Court could order him confined.  That argument relies on a

nexus between the generalized COVID-19 pandemic and Mr. Hanes

Calugaru's detention and ability to be guided by his parents'

moral suasion insofar as his parents continue to be the

proposed guarantors.  The Court finds that nexus insufficient

to have a material bearing on the Court's risk of flight

determination.  A defendant's own evaluation of his character

is not new information for purposes of reopening a bail

hearing.  See *United States v. Esposito*, 354 F.Supp.3d 354, 361

(S.D.N.Y. 2019).  The facts relied on of the general contagion

or general risk of contagion of the world are facts, but as to

his character and his reaction to the change of circumstances

as reasons he would choose to abide by conditions of release

K541calc

1    rather than flee and avoid trial and the health risks of

2    continued confinement altogether are just that, assessments,

3    and too speculative to rise to the level of fact as to his

4    behavior.

5          Accordingly, the Court finds that Mr. Hanes has not

6    offered any facts that are material to the Court's assessment

7    of the specific risk of flight that he poses and the

8    application is denied insofar as it seeks reopening of the bail

9    hearing.

10         Mr. Hanes Calugaru also moves pursuant to

11   Section 3142(i) of Title 18 for temporary release during the

12   public health emergency.  3142(i) empowers the Court to permit

13   the temporary release of a detainee to the extent that the

14   Court determines such release to be necessary for the

15   preparation of the person's defense or for another compelling

16   reason, and as Ms. Shellow has noted, I have recognized that

17   release may be necessary to protect certain defendants with

18   underlying conditions that may render them especially

19   vulnerable to COVID-19, high risks of either contracting the

20   disease or suffering severe manifestations of the disease.  The

21   health conditions that have been cited by Mr. Hanes are not

22   ones that place him in the high risk category defined by the

23   CDC, and at age 40, he is not in an age-related high risk

24   category.  Defendants who have been released temporarily in

25   this district on health grounds have had serious respiratory

K541calc

1   conditions or diseases that specifically put them at an

2   elevated risk of infection or the development of complications

3   if infected.  The health-related risk is evaluated on an

4   individual-by-individual basis, and the Court finds that

5   Mr. Hanes has proffered insufficient information to persuade

6   the Court that he is personally at greater risk as an

7   individual than members of the detainee population of the MDC

8   in general.

9       The BOP has implemented policies and consulted with

10  various experts to develop and implement strategies that are

11  intended to mitigate the risks posed by COVID-19 insofar as

12  possible in the context of the Bureau of Prisons facilities,

13  resources, and mission.  Those mitigation measures do not and

14  cannot eliminate the risk of COVID-19 but they are calculated,

15  as I have indicated in earlier decisions, and reiterate here,

16  to mitigate the risk of infection in the inherently close

17  quarters of the facility, for all persons in custody and for

18  Bureau of Prisons staff, and the risks that are faced by any

19  particular individual by reason of crowding and other

20  conditions has to be balanced against, in Mr. Hanes's case, the

21  risk of flight that he poses.

22      The information that has been proffered in connection

23  with the ongoing litigation regarding the sufficiency of the

24  MDC's measures is not sufficient to show a compelling

25  particularized personal risk enhancement or a generally

K541calc

heightened risk sufficient to overcome the needs that I have

previously found to detain Mr. Hanes to protect against the

risk that he will flee and not face the serious charges that

have been lodged against him.  I find that the risk of flight

cannot reasonably be managed by temporary pretrial release

conditions, particularly during the public health crisis, when

supervision and policing resources are strained.

        Accordingly, I find that there is no compelling reason

on health grounds for temporary release, and the application

pursuant to Sections 3142(f) and 3142(i) is denied.

        The Court will enter an order stating that the

application is denied for the reasons stated on the record.

        Counsel, I thank you for your arguments and your

submissions.  Is there anything further that we should take up

together this afternoon?

        MR. ROTHSCHILD:  This is Sam Rothschild.  Nothing from

the government, your Honor.

        THE COURT:  Ms. Shellow, are you still there?

        Oh, no.  Ms. Shellow?

        Ms. Ng, are you still there?

        THE DEPUTY CLERK:  Yes, I'm still here.

        THE COURT:  And is Ms. Shellow's line still showing as

live?

        THE DEPUTY CLERK:  Give me one second.

        Yes, it's still showing that there's nine people on.

K541calc

1  The thing is that her number is an unlisted number.

2            Oh, here she is.

3            THE COURT:  Ms. Shellow?

4            She just dropped off?

5            THE DEPUTY CLERK:  Yes, she just dropped off.  She'll

6  come back on, I'm hoping.

7            THE COURT:  All right.  Let's wait a couple of minutes

8  for her to come back on.  I have a 4:00, so we are going to

9  need to switch over to another telephone conference shortly.

10 And I will be filing an order.

11           Let's wait another minute and see if she dials back

12 in.

13           (Pause)

14           THE COURT:  Ms. Ng, you don't see any sign of her

15 dialing in?

16           THE DEPUTY CLERK:  No, not at all.

17           Oh, wait.  No, that's someone calling me about the

18 other conference.

19           THE COURT:  Okay.  Well, this transcript is complete.

20 I will include in the order that I file a request that

21 Ms. Shellow explain this hearing to Mr. Hanes Calugaru and

22 provide him with a copy of the transcript.

23           Did someone just come back on?

24           MS. SHELLOW:  Yes.  This is Ms. Shellow.  I apparently

25 disappeared for a moment.  I'm back.

K541calc

| | |
|---|---|
| 1 | THE COURT:  I don't know.  The AT&T poltergeists are |
| 2 | working overtime today. |
| 3 | Did you hear me address 3142(i)? |
| 4 | MS. SHELLOW:  Yes, I did, your Honor. |
| 5 | THE COURT:  And so the conclusion that I reached is |
| 6 | that the application is denied both as to 3142(f) and 3142(i). |
| 7 | I'm going to enter an order stating that the |
| 8 | application is denied for the reasons stated on the record, and |
| 9 | I would ask that you describe this hearing and the results to |
| 10 | Mr. Hanes and provide him with a copy of the transcript, and I |
| 11 | authorize translation of the transcript if that is necessary to |
| 12 | give him access to the information. |
| 13 | MS. SHELLOW:  Thank you, your Honor. |
| 14 | THE COURT:  Thank you. |
| 15 | And I thanked counsel and I thank you for your |
| 16 | advocacy and for your submissions. |
| 17 | Is there anything further that we need to take up this |
| 18 | afternoon, Ms. Shellow? |
| 19 | MS. SHELLOW:  No, there's not.  Thank you, your Honor. |
| 20 | THE COURT:  And Mr. Rothschild, you said that there's |
| 21 | nothing from the government's perspective? |
| 22 | MR. ROTHSCHILD:  This is Sam Rothschild.  That's |
| 23 | correct, your Honor. |
| 24 | THE COURT:  Thank you.  Then we are adjourned.  Stay |
| 25 | safe and keep well, everyone.  Thank you. |

K541calc

1            MS. SHELLOW:  Likewise, your Honor.  Stay safe.

2            MR. ROTHSCHILD:  Thank you, your Honor.  Bye-bye.

3            MR. AHMED:  Thank you, your Honor.

4                              o0o

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25