UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------x

UNITED STATES OF AMERICA

     v.                                      Case No. 19-cr-651-LTS

GABRIEL ORZANICA,

                *Defendant.*

---------------------------------------------x

## SENTENCING MEMORANDUM OF GABRIEL ORZANICA

Kristen M. Santillo, Esq.
Samuel Steinbock-Pratt, Esq.
GELBER & SANTILLO PLLC
347 W. 36th Street, Suite 805
New York, NY 10018
Tel: 212-227-4743
Fax: 212-227-7371
ksantillo@gelbersantillo.com

*Counsel for Gabriel Orzanica*

**Table of Contents**

I. Background..............................................................................................................2

   A. Mr. Orzanica's Family Background..............................................................2

   B. Mr. Orzanica's Work History.......................................................................4

   C. Mr. Orzanica's Fraught Marriage and the Birth of his Beloved Daughter, J...........4

   D. The Offense Conduct ...................................................................................6

   E. Mr. Orzanica's Post-Offense Role as a Caregiver in Romania .................6

   F. Mr. Orzanica's Arrest and the Punishing Conditions of his Pretrial Detention ..........7

   G. The Devastating Impact of Mr. Orzanica's Incarceration on his Family..................11

II. The 3553 Factors Support a Sentence of Time Served ........................................12

   A. The Nature and Circumstances of the Offense Warrant Leniency ...........13

   B. Mr. Orzanica's History and Characteristics Warrant Leniency .................13

   C. A Sentence of Time Served is Sufficient to Promote Respect for the Law, to Provide Just Punishment for the Offense, for Deterrence, and to Protect the Public from Future Crimes of Mr. Orzanica ........................................................15

   D. A Sentence of Time Served Would Avoid Unwarranted Sentencing Disparities Among Similarly Situated Codefendants.................................................17

   E. A Sentence of Time Served Would Enable Mr. Orzanica to Obtain Needed Medical Care ........................................................................................18

III. Conclusion .........................................................................................................19

## Table of Authorities

### Cases

*United States v. Carrillo Berber*, 18-cr-703 (PAC), ECF No. 28 (S.D.N.Y. June 11, 2020)....... 16

*United States v. Chavis*, 19-cr-620 (DLC), ECF No. 35 (S.D.N.Y. Aug. 14, 2020) .................... 16

*United States v. Morgan*, 19-cr-209 (RMB), ECF No. 90 (S.D.N.Y. May 5, 2020).................... 16

*United States v. Rodriguez*, 19-cr-817 (LAK), ECF No. 45 (S.D.N.Y. Oct. 6, 2020)................. 16

*Zavala v. Ives*, 785 F.3d 367 (9th Cir. 2015) .............................................................................. 15

### Statutes

18 U.S.C. § 1349 ............................................................................................................................ 1

18 U.S.C. § 3553(a) ..................................................................................................................... 12

18 U.S.C. § 3585(b) ..................................................................................................................... 15

On April 14, 2021, Gabriel Orzanica, a 51-year-old Romanian citizen, will be sentenced by this Court for his limited role in a conspiracy to commit wire and bank fraud in violation of 18 U.S.C. § 1349. While Mr. Orzanica was charged along with multiple other defendants in an Indictment alleging a widespread and complex international ATM skimming operation, Mr. Orzanica's role in the offense was narrow: he withdrew cash from ATMs in Rhode Island on a few days in July and August 2016. While Mr. Orzanica fully accepts responsibility for this misconduct and recognizes that it is a serious offense, he has already been severely punished for his conduct.

By the time he was arrested for this offense in November 2019, Mr. Orzanica had returned to Romania and had been living a modest life for three years, working on his family farm and serving as a critical caregiver to his beloved 10-year-old daughter; his sister who suffers from schizophrenia, epilepsy, and diabetes; his fatherless teenage nephew; and his ailing elderly father. After awaiting extradition in a Romanian jail for nearly three months, Mr. Orzanica was transported to New York City, over 4,000 miles away from his family, on February 13, 2020. The timing could not have been worse. Mr. Orzanica arrived just weeks before the Metropolitan Correctional Center ("MCC") where he has been detained was placed on a restrictive lockdown when it was discovered that a gun had been smuggled into the facility, which was followed soon thereafter by prolonged and successive COVID-19 lockdowns that have not ceased.

Mr. Orzanica, who struggles with English, has been isolated, not only from his support network in Romania, but also from his fellow inmates and the MCC staff, who have had difficulty communicating with him. He has also suffered tremendous stress and anxiety, not only from fear of catching the deadly virus, but from other pressing ailments that were left untreated

by the strained MCC medical staff. Finally, he has been overcome with guilt that his misconduct has prevented him from being there for his family members, who desperately need him and have been anxiously awaiting his return.

Mr. Orzanica's Guidelines range is 33–41 months, driven by the dollar amount of the cash skimmed by the Rhode Island conspirators as a whole, as opposed to Mr. Orzanica's personal profits, which were much less. In light of Mr. Orzanica's limited role in the offense, the harsh conditions of his pretrial confinement for the 17 months leading up to sentencing, his role as a critical caregiver in Romania, the commensurate sentences of his co-defendants, and the inevitable delays he will face in returning to Romania, the defense submits that a sentence of time served is sufficient but not greater than necessary to serve the goals of sentencing.

I.    **Background**

A.    **Mr. Orzanica's Family Background**

Gabriel Orzanica was born in 1969 in Zarnesti, a suburb of Brasov, in Romania. PSR ¶ 82. He is the youngest of three children born to his parents, Valeriu Orzanica and Ligia Balau. *Id.* Unfortunately, Mr. Orzanica's family has been plagued by mental illness. For many years, beginning in Mr. Orzanica's childhood, his mother suffered from paranoid schizophrenia. *See* Ex. A at 2, Psychological Evaluation by Catherine M. Barber ("Barber Rep."); Ex. B at 3, Letter from Scortea Andreea ("Andreea Ltr.").[1] Because of her schizophrenia, Ligia was frequently hospitalized and was largely absent from Mr. Orzanica's life, sometimes staying with the family only a few hours a week. Barber Rep. at 2. Mr. Orzanica's mother was ultimately committed to a psychiatric hospital around 15 years ago as a result of her schizophrenia and worsening symptoms of dementia. *Id.*; PSR ¶ 82.

---

[1] Where exhibits are not internally paginated, pin cites refer to PDF pagination.

As a result, Mr. Orzanica was largely raised by his maternal grandmother (who also raised Mr. Orzanica's cousin and close friend, Scortea). *See* Andreea Ltr. at 3. Despite these many difficulties, Mr. Orzanica felt loved and supported by his grandparents, particularly his grandmother. Barber Rep. at 3. Her death some 25 years ago caused him a tremendous amount of grief. *Id.*

Sadly, Mr. Orzanica's siblings have also been afflicted by serious mental illness. His older brother, Damian, began to exhibit symptoms of mental illness after completing his compulsory military service. *See* Andreea Ltr. at 5. He was admitted to a psychiatric hospital around 14 years ago. Tragically, after being administered sedatives, he suffered a heart attack and died. *Id.* Mr. Orzanica's sister, Violeta, was diagnosed with schizophrenia at a young age, like their mother, and also suffers from epilepsy and diabetes. *Id.* at 6; Barber Rep. at 3. She currently lives with their father, Valeriu, in the mountainous town of Poiana Marului, near Brasov. Andreea Ltr. at 6; PSR ¶ 83.

Luckily, Mr. Orzanica has not, to date, exhibited symptoms of dementia or schizophrenia. However, he has developed serious emotional problems as a result of his mother's inconsistent presence in his life. Because of the limited involvement of his parents in his upbringing, Mr. Orzanica's ability to relate to and socialize with other people was stunted. As Dr. Barber explains:

> Complex Trauma, or chronic post-traumatic stress, develops from repeated exposures beginning in childhood to insecure, neglectful, and/or threatening attachment relationships, most specifically within the family. Repeated exposure to a caretaker who demonstrates unstable, unreliable behavior (as triggered by factors such as substance abuse, behavioral violence, or severe mental illness) erode[s] the child's sense of security and integrity of the self, impeding their emotional development and hampering their ability to learn to relate to others in healthy ways.

Barber Rep. at 8. Children often develop feelings of abandonment, for which they then try to overcompensate. *Id.* In Mr. Orzanica's case, he feels tremendous pressure to act as a caretaker

for his family members, to provide the stabilizing presence that his mother was unable to provide for him as a child. *Id.*

### B.     Mr. Orzanica's Work History

Mr. Orzanica completed the 10th grade and then attended a trade school, earning a certificate in light industry. Barber Rep. at 4. Like many in Brasov (including his father, mother, and sister), Mr. Orzanica was trained to work as a supervisor in a garment factory. PSR ¶¶ 82–84, 92.

Beginning in 1989, Mr. Orzanica began his compulsory military service and joined the Romanian Naval Forces. PSR ¶ 93. He trained as a naval mechanic and attained the rank of corporal. He was honorably discharged in 1991. *Id.*

Later in life, Mr. Orzanica became an entrepreneur. In 2003, he founded Orzanica Society, a construction and home restoration business that he would operate until 2009. PSR ¶ 97. In 2011, he opened a bakery in Brasov, Magic Bagel, with his childhood friend Buzneru Mugurel-Georgel. PSR ¶ 95; Ex. C at 2, Letter from Buzneru Mugurel-Georgel ("Mugurel Ltr."). Mr. Orzanica was deeply invested in the bakery, and was an attentive and caring boss. According to Buzneru, "[t]he employees only had words of praise about Gabriel. . . . He used to work hand-in-hand with the employees whenever it was necessary." Mugurel Ltr. at 2. Unfortunately, due to rising debts and financial difficulties, Mr. Orzanica had to shut down Magic Bagel in 2015. This failure of Mr. Orzanica's business was part of a series of cascading events that led to Mr. Orzanica's travel to the United States in 2016, and his involvement in this offense.

### C.     Mr. Orzanica's Fraught Marriage and the Birth of His Beloved Daughter, J.

In 2009, Mr. Orzanica married Luminita Diana Orezeanu. Unfortunately, the union was fraught. The two did not get along, and could not agree on where to live—Mr. Orzanica wished

to remain in Brasov, while his wife wanted to stay in Constanta, some 400 kilometers away. *See* Andreea Ltr. at 4. They ended up living separately, and ultimately divorced in 2015. PSR ¶ 85.

Despite the difficulties in his marriage, Mr. Orzanica was overjoyed by the birth of their daughter, J.O. J., now 10 years old, is the light of Mr. Orzanica's life; in the words of Mr. Orzanica's friend and neighbor, he is "an exemplary father" who "dedicates himself totally to the upbringing of his daughter." Ex. D at 2, Letter from Darlea Florin Ionut ("Ionut Ltr."). For the first five years of her life, prior to the divorce, J. lived with Mr. Orzanica. *See* Andreea Ltr. at 5. Her young mother resisted the burdens and responsibilities of parenting, and Mr. Orzanica was eager to fill the void to protect his child from feeling any sense of neglect or abandonment, as he had experienced. As a perceptive parent, though, he could tell that her mother's absence took a toll on J., no matter how hard he tried to fill both roles. On one occasion, J. asked him why her mother was not with her, like all the other girls' mothers, and whether it was because her mother hated her. *Id.* This crushed Mr. Orzanica.

After the divorce, Mr. Orzanica made the difficult decision to allow J.'s mother to take custody of their daughter, as he himself was struggling financially and emotionally due to the stress of the separation, and he knew that it was important for J. to develop a closer bond with her mother. He was determined, however, to remain a constant presence in his daughter's life, despite the great distance between them. He visited J. every week, *see* Andreea Ltr. at 5, and spoke to her by telephone daily, *see* Ionut Ltr. at 2. J. would also come to visit Mr. Orzanica whenever she had a vacation from school. *See* Mugurel Ltr. at 2–3.The separation from her father was very difficult for J.; when she was with her mother in Constanta, she would regularly lock herself in her room and refuse to speak to anyone. *Id.* at 3. But Mr. Orzanica did his best to provide a stabilizing presence in her life, even from a distance.

### D.        The Offense Conduct

The offense conduct occurred when Mr. Orzanica was in a downward spiral and his personal and professional life were in disarray. He and his wife had finally divorced after five turbulent years. His beloved daughter J. had returned to Constanta to live with her mother, far from Mr. Orzanica's home in Brasov, and he constantly worried about her emotional wellbeing. The bakery he had been running with his childhood friend had shut down. In addition to being a primary caretaker for his daughter, he was the sole source of support for his father, sister, and nephew. The stress and anxiety caused by the confluence of all these difficulties took a psychological toll on Mr. Orzanica. He entered a period of prolonged depression, and his mental anguish also negatively impacted his physical wellbeing: he suffered from back pain, developed a bad rash, and began to have constant headaches, to the point that he feared he would have a stroke. Barber Rep. at 5.

During this turbulent time, Mr. Orzanica decided to distance himself from the stresses in his life and escaped to the United States, where he made the regrettable choice to engage in the charged conduct. During his brief stay in the United States, Mr. Orzanica participated in "cash-outs" at certain locations in Rhode Island for a few days in July and August of 2016. PSR ¶ 39. The total loss amount attributable to all co-conspirators during this series of skimming attacks in Rhode Island was $359,043.02, although Mr. Orzanica himself withdrew a much smaller amount—approximately $70,000—and profited even less, as he shared the proceeds with his co-conspirators. Having broken away and gained perspective, he used the proceeds of the offense to return to Romania, where he immersed himself in his caregiving role until November 2019.

### E.        Mr. Orzanica's Post-Offense Role as a Caregiver in Romania

When Mr. Orzanica returned to Romania, he resumed his role as an active caregiver to his daughter and even began writing books on parenting and the benefits of clean eating. To

support his father and his sister, he also took on an active role at the family farm. Mr. Orzanica's only living sibling, Violeta, lives with their father Valeriu on a farm in Poiana Marului, a rural and mountainous area near Brasov. PSR ¶ 83; Andreea Ltr. at 6; Ionut Ltr. at 2. Valeriu, who is in his 80s, is ill, and still suffers from a leg injury he sustained in a motorcycle accident when he was younger. *See* Ionut Ltr. at 2. Because of this, he has grown increasingly dependent upon Mr. Orzanica's assistance with the household chores, such as splitting wood and mowing the grass. *See* Mugurel Ltr. at 3. Mr. Orzanica was also central to his father's medical care, taking him to the hospital and paying for medical bills. *See* Andreea Ltr. at 3–4.

Valeriu and Violeta also live with Violeta's son, L., who is 15 years old. L. was born as the result of a sexual assault and never knew his father, so Mr. Orzanica took on the role of his primary father figure. *See* Ionut Ltr. at 2; Barber Rep. at 3. L. has difficulty communicating and socializing, and requires speech therapy. Mr. Orzanica worries that L. may have difficulty relating to other people, just as Mr. Orzanica did when he was younger as a result of his own mother's mental illness. When he was living in Romania, Mr. Orzanica tried to offer love, support, and guidance, to help L. navigate his teen years and guide him to adulthood.

### F.     Mr. Orzanica's Arrest and the Punishing Conditions of his Pretrial Detention

Mr. Orzanica was arrested and detained in Romania in connection with this offense on November 20, 2019. After nearly three months in a Romanian jail, he was extradited to the United States on February 13, 2020 and has been detained at the MCC ever since.

By the date of his sentencing, Mr. Orzanica will have been detained for 17 months. In that time, he has endured brutal conditions, which have been far more severe than in ordinary circumstances. Almost immediately after Mr. Orzanica's transfer to the MCC, he, along with every other inmate in the facility, was placed on 24-hour lockdown for a full week, as the facility scrambled to find a smuggled gun. *See* Stephen Rex Brown, *Strip searches, frozen bologna*

*sandwiches and wrecked cells: MCC inmates detail lockdown due to smuggled gun*, N.Y. Daily News, March 6, 2020, https://www.nydailynews.com/new-york/ny-mcc-lockdown-accounts-20200306-aws7qoa7ejcozai3i64hms73qi-story.html. Inmates were subjected to strip searches, forced to wash their clothes in sinks and toilets, and denied hot food, subsisting on cold bologna sandwiches. *Id.*

 During the lockdown Mr. Orzanica was given inconsistent orders, where he was "ordered to lie on the ground, then ordered to move." Barber Rep. at 5. He recalled that the special forces that came to search his cell "hit [him] with their boots a few times" because he was not following their directions, which he did not fully understand. *Id.* at 5–6. This early experienced instilled a fear in Mr. Orzanica that his limitations in communicating in English could put him in danger for appearing to violate rules. *Id.* at 6. This fear for his safety has persisted since he has been at the MCC.

 Mr. Orzanica has also been living in continuous fear that the language barrier could cause misunderstandings leading to an altercation with other inmates. He has noticed that "other inmates often seem primed to be aggressive toward him due to the language barrier," and he "worried that they misinterpreted his lack of understanding as him projecting a negative attitude." *Id.* He has also perceived "an additional undercurrent of racial tension, as there are very few other white inmates in his unit. He said these stressful encounters came up fairly often in the context of waiting for such things as showers or phone calls, and he often felt threatened." *Id.* These factors have contributed to a growing sense of isolation. This problem has only been exacerbated by the fact that he has recently lost hearing in his left ear, which further hampers his ability to communicate. PSR ¶ 89.

 In addition to these stressors, shortly after the gun lockdown, the MCC entered another

series of endless lockdowns, this time in an attempt to contain the unprecedented COVID-19

pandemic. As a result of these lockdowns, Mr. Orzanica's movement has been restricted, his

access to email and calls to communicate with family and his attorney has been limited, and he

has faced the constant anxiety of potentially contracting a deadly disease.

Mr. Orzanica's prolonged pretrial incarceration has been even harder as a result of long-

term problems with his physical and mental health. Mr. Orzanica has an undescended right

testicle, a condition which is known to greatly increase the risk of testicular cancer. *See, e.g.*,

American Cancer Society, *Risk Factors for Testicular Cancer*,

https://www.cancer.org/cancer/testicular-cancer/causes-risks-prevention/risk-factors.html

(updated May 17, 2018) ("One of the main risk factors for testicular cancer is a condition called

cryptorchidism, or undescended testicle(s). … Males with cryptorchidism are many times more

likely to get testicular cancer than those with normally descended testicles."); Mayo Clinic,

*Undescended Testicle*, April 19, 2019, https://www.mayoclinic.org/diseases-

conditions/undescended-testicle/symptoms-causes/syc-20351995 ("Men who've had an

undescended testicle have an increased risk of testicular cancer."). Prior to his extradition, Mr.

Orzanica was scheduled to have surgery in Romania to address the problem and mitigate the risk

of cancer. PSR ¶ 88. That surgery was interrupted by his arrest, however, and despite multiple

requests for medical attention, the medical staff at the MCC has not scheduled Mr. Orzanica for

surgery or to see a urologist. Mr. Orzanica is extremely anxious that this longstanding medical

problem has gone unaddressed, and worries that he may develop testicular cancer, which is more

concerning to him than even the conditions of his confinement.

Mr. Orzanica's pretrial detention has also taken a significant toll on his mental health.

Mr. Orzanica has been experiencing serious symptoms of depression and anxiety, related not

only to the seriousness of the charges against him but also from his separation from his family,

his isolation from the staff and fellow inmates at the MCC due to the language barrier, his fear of

catching COVID-19, and the lack of treatment for his serious medical conditions, which he fears

could jeopardize his life, as detailed above. When Mr. Orzanica reached out for help with his

mental health at the MCC, he was required to speak to the medical staff through a cell door, and

had to speak loudly, so that the entire cell block could hear. PSR ¶ 90. Obviously, such an

environment was not conducive to the frank and confidential conversation that is necessary for

psychiatric treatment. The next time Mr. Orzanica requested to see a mental health professional,

the only response was that someone came to his cell to ask if he was suicidal, and when he said

no, walked away. *Id.* Already in an isolated and depressed state, this solidified for Mr. Orzanica

that nobody at the MCC cared for his wellbeing. Defeated by the indifference of the MCC

medical staff, he has given up on asking for help. Barber Rep. at 6.

As a result of his incarceration, combined with the pain of separation from his daughter,

Mr. Orzanica is experiencing serious depression and anxiety, which Dr. Barber has diagnosed as

an Adjustment Disorder, "the development of physiological, emotional, or behavioral symptoms

of distress in response to an identifiable stressor, occurring within three months of the onset of

the stressor." Barber Rep. at 7. His mental and emotional state has caused him to feel the

pressures of incarceration more intensely than most, even before accounting for the enormous

difficulties imposed by the pandemic and constant lockdowns. *Id.* at 9.

Despite these tremendous challenges to his physical and mental health, Mr. Orzanica has

managed to contribute the skills that he learned managing a bakery in Romania to running the

kitchen at the MCC. R. Boney, the Food Services Supervisor at the MCC, reports that during the

pandemic "Inmate Orzanica was instrumental in keeping the food service department running

smoothly." Ex. E, Letter from B. Boney ("Boney Ltr."). Since August 2020, when he began working in the kitchen, Mr. Orzanica "has not missed a day of work." *Id.* He was "responsible for the training of other inmate workers and has demonstrated a great work ethic." *Id*. Mr. Orzanica earned a ServSafe certificate, and Boney described him as "very professional at work, an extremely hard worker, [who] puts all his efforts to get the job done in the given time." *Id*.

Mr. Orzanica has also been teaching himself English, *see* Barber Rep. at 6, and further developing his ideas for his books-in-progress on parenting and clean eating. The attached excerpts from the philosophies and ideas Mr. Orzanica has been developing about parenthood while at the MCC show an intelligent and articulate person who is deeply introspective, at his core optimistic in spite of the difficulties he has been facing, and committed above all to raising his daughter and making the world a better place for her. *See* Ex. F, Orzanica Excerpts. The rich inner life evidenced by his writings also demonstrates how lonely and isolating Mr. Orzanica's experience has been, as he has been unable to express his thoughts with anyone around him.

Mr. Orzanica's dedication to work in the kitchen and his writings in such a time of adversity shows that Mr. Orzanica has the capability of leading a hard-working, law-abiding life and has much to contribute when he returns to Romania.

### G.      The Devastating Impact of Mr. Orzanica's Incarceration on his Family

Mr. Orzancia has long been the linchpin holding his family together, and it grieves him that during his 17-month absence, the family has been falling apart.

J. has suffered greatly from her father's extended absence. Just as she used to wonder whether her mother's absence was her fault, she now fears that Mr. Orzanica is angry with her or doesn't love her any more. Andreea Ltr. at 5. It is torturous for Mr. Orzanica to know that his daughter is missing him, and that his own misconduct has prevented him from being able to be there for her. For so many years, he tried to protect his daughter from the feelings of neglect and

abandonment he experienced as a child, and it pains him that instead he has been the cause of such feelings.

Mr. Orzanica's father, Valeriu, is very ill, and has told Mr. Orzanica he is fighting to live long enough so that he can see his son again. Since Mr. Orzanica's arrest, Valeriu has been unable to maintain the land and was forced to give up some of the animals he had been raising. *Id.* at 3. Mr. Orzanica is eager to return to Romania to see his father, take the burden of the land off of him, and ease his agitated mind.

Mr. Orzanica's nephew, L., was once a well-behaved and diligent student. Since Mr. Orzanica's arrest he has begun to act more rebellious, hanging around with other teenagers and drinking alcohol. *Id.* at 4. Mr. Orzanica's cousin, Scortea, fears that L. is overwhelmed by the responsibility he now shoulders in Mr. Orzanica's absence. *Id.* With Mr. Orzanica gone, L. has needed to take on more and more of the household chores, since his grandfather is unable to do so much of the work. Just a teenager, he has rebelled, shirking his responsibilities to spend time with his friends instead of providing needed support to his grandfather. *Id.* Mr. Orzanica hopes to return to Romania so that he can resume his role as a father figure to L. and correct his course.

## II.   The 3553 Factors Support a Sentence of Time Served

Among the factors to be considered under 18 U.S.C. § 3553(a) are "(1) the history and characteristics of the defendant," and "(2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from future crimes of the defendant; and (D) to provide the defendant with needed … medical care … in the most effective manner." 18 U.S.C. § 3553(a)(1)–(2). Here, the 3553(a) factors warrant a sentence of time served.

### A.    The Nature and Circumstances of the Offense Warrant Leniency

With respect to the nature of the offense, Mr. Orzanica's participation in the charged offense was narrow in scope. Mr. Orzanica was charged in a conspiracy with dozens of other defendants, and it was alleged that he was part of an international skimming organization that targeted hundreds of ATMs across 17 states resulting in losses of over $20,000,000, with over $11,000,000 in traceable losses. PSR ¶ 30–31. By contrast, Mr. Orzanica's involvement in the charged conspiracy primarily consisted of cash-outs at ATMs in Rhode Island over the course of a few days in July and August of 2016. The loss amount from the Rhode Island portion of the conspiracy as a whole was $359,043.02, with Mr. Orzanica personally handling closer to approximately $70,000 (his stipulated forfeiture amount is $71,808.60), and profiting still less, as he shared the proceeds with his co-conspirators.

Mr. Orzanica's involvement in the offense also came at a low point in his life, when his personal and professional life were in turmoil and he was suffering from anxiety and depression. While he sought a brief escape from his responsibilities through travel to the United States, Mr. Orzanica gained perspective on his trip, and used the proceeds from the offense to return to Romania, where he lived as a responsible caretaker to his daughter, his mentally ill sister and her teenage son, and his ailing father for three years before his arrest. Mr. Orzanica's limited role in the offense and the context in which it arose warrant leniency.

### B.    Mr. Orzanica's History and Characteristics Warrant Leniency

Mr. Orzanica's history and characteristics also warrant leniency. As recounted above, Mr. Orzanica is a 51-year-old non-violent offender. His offense conduct was extremely brief, and arose from a series of poor decisions made during a time of enormous financial, emotional, and personal instability.

Throughout his life, and especially in the three years after his involvement in this offense, when his father's health was rapidly deteriorating, Mr. Orzanica was a pillar of support for his family. He also was an "extraordinary moral support" for his cousin Scortea when she "was a single mother with two small children." Andreea Ltr. at 6. He offered Scortea a job at the Magic Bagel and was always available to listen to her problems. *Id.*

Mr. Orzanica's friends and family also unanimously attest to his warm and generous nature. His neighbor Darlea, who has known him for nearly a decade, describes him as "a friendly man" who is "amiable, respectful, sincere, serious." Ionut Ltr. at 2. He is a "hardworking" and "trustworthy man" who has supported Darlea and many other people. *Id.* at 3. She recounts how he has often helped others, from "[buying] food for a needy woman who had a baby in a carriage and was standing at the entrance to a store" to helping "a neighbor in the building … to repair a bed that was broken." *Id.* at 2. Mr. Orzanica, she says, "is a faithful man" who "prays to God to enlighten his thoughts, his soul, his heart, his mind." *Id.* at 3.

Mr. Orzanica has also shown that he is capable of sustained hard work in lawful endeavors. He founded and for years operated a home renovation business and a bakery. Orzanica's childhood friend and former business partner, Buzneru, reports that Mr. Orzanica was a "top-notch" boss who made sure his employees were always paid on time. Mugurel Ltr. at 2. And he is not just comfortable acting in a leadership position; he is also willing to do the "grunt work," so to speak. Buzneru recalls that Mr. Orzanica "never had a bossy attitude" and "used to work hand-in-hand with the employees whenever it was necessary." *Id.* While incarcerated, Mr. Orzanica has been a reliable kitchen worker, taking on both front-line tasks such as operating the dish machine and running the inmate serving line, while also excelling in a managerial role by training other inmate workers. *See* Boney Ltr. He has also devoted considerable attention to his

14

writings while at the MCC, which demonstrates that he is deep thinker who is observant about the world around him and committed to changing himself to become a better person so that he can serve as a better role model for his daughter.

While Mr. Orzanica undoubtedly committed a serious offense, and he deeply regrets participating in ATM skimming, his history of entrepreneurship and intellectual pursuits, his strong work ethic, his three-year post-offense conduct, and the letters from his friends and family show that he is a family man at heart who will devote himself to writing and caring for his family upon his return to Romania, and not to criminal activity.

### C. A Sentence of Time Served is Sufficient to Promote Respect for the Law, to Provide Just Punishment for the Offense, for Deterrence, and to Protect the Public from Future Crimes of Mr. Orzanica

There can be no doubt that Mr. Orzanica has been severely punished for his offense, and he has unquestionably learned that his actions have serious consequences, not only for Mr. Orzanica himself, but also for his loved ones.

By the time of sentencing, Mr. Orzanica will have been incarcerated for 17 months, under exceptionally harsh conditions.[2] Assuming good-time credit would be applied, Mr. Orzanica's 17 months of pretrial incarceration would be the equivalent of a 20-month sentence. The requested sentence of time served therefore reflects only a modest variance, which is more than justified in light of the grueling conditions Mr. Orzanica has endured at the MCC.

Indeed, many judges have imposed sentences of time served, sometimes varying

---

[2] It is well established that Mr. Orzanica should be credited by the BOP for the time he spent in Romanian custody, prior to his extradition to the United States. *See* 18 U.S.C. § 3585(b); *Zavala v. Ives*, 785 F.3d 367, 377 (9th Cir. 2015) ("BOP already grants sentencing credit for time spent in state or foreign custody where that time was not credited to another sentence."). Accordingly, in considering whether a sentence of time served is appropriate, this Court should evaluate the total time Mr. Orzanica has spent in custody in relation to this offense, including the time Mr. Orzanica spent in a Romanian detention facility.

significantly below the Guidelines range, in recognition of the exceptional toll that the COVID-19 pandemic has taken on the incarcerated population. *See, e.g.*, Sentencing Tr. 7, 20, *United States v. Chavis*, 19-cr-620 (DLC), ECF No. 35 (S.D.N.Y. Aug. 14, 2020) (varying below 46–57 months Guidelines range to impose a sentence of 36 months' incarceration, and stating: "I can't ignore that your time in prison has been even worse than it would otherwise be because of the pandemic"); Sentencing Tr. 17, *United States v. Rodriguez*, 19-cr-817 (LAK), ECF No. 45 (S.D.N.Y. Oct. 6, 2020) (varying below 24–30 months Guidelines range to sentence defendant convicted of selling oxycodone to time served following 10 months of pretrial detention, and stating: "the conditions of incarceration to which you have been subjected because of the pandemic over much of the last ten or eleven months have really been very unusual and very harsh … . They are a lot worse than they would have been otherwise, and they are certainly a lot worse than if you had been serving a sentence."); Sentencing Tr. 23–25, *United States v. Carrillo Berber*, 18-cr-703 (PAC), ECF No. 28 (S.D.N.Y. June 11, 2020) (varying below 46–57 months Guidelines range to sentence defendant convicted of conspiracy to distribute heroin to time served—equivalent to 22 months' incarceration—based on harsh conditions of pretrial confinement at MDC); Sentencing Tr. 13–15, 34, *United States v. Morgan*, 19-cr-209 (RMB), ECF No. 90 (S.D.N.Y. May 5, 2020) (varying below 41–51 months Guidelines range to sentence defendant convicted of conspiracy to commit bank fraud of time served—equivalent to 15 months' incarceration—and noting the "terrible conditions" of pretrial confinement at both MDC and MCC).

Even leaving aside the pandemic, Mr. Orzanica's pretrial incarceration has been particularly harsh because the language barrier has left Mr. Orzanica isolated from fellow inmates and the staff, he has received inadequate attention for his serious medical conditions that

has caused him great anxiety, and he has been detained thousands of miles away from his family.

As the caregiver in his family, he has been distraught by how his absence has negatively

impacted his family, while he has been helpless to do anything about it. As an inmate with a

history of depression and anxiety and an extensive family history of mental illness, these

stressors have taken a devastating toll on his mental health, which increases the punitive impact

of his 17-month sentence. As Dr. Barber explains:

> Consideration of his personal history, in conjunction with appreciation of the
> emotional pain he is experiencing due to the prolonged separation from his child,
> as well as his chronic fearfulness in the jail setting due to the language barrier and
> his serious health concerns, all indicate that Mr. Orzanica has experienced an
> extremely strong degree of punitive impact from his incarceration thus far, even
> separate and apart from the strict conditions of confinement during the successive
> lockdowns.

Barber Rep. at 9. These factors fully justify the modest variance Mr. Orzanica seeks. As a

Romanian citizen, Mr. Orzanica will also undoubtedly face immigration delays when he returns

to Romania, particularly given the necessity of quarantining and observing pandemic safety

protocols. While he has consented to removal to expedite removal, anticipated delays in his

return home further justify a sentence of time served.

### D.  A Sentence of Time Served Would Avoid Unwarranted Sentencing Disparities Among Similarly-Situated Codefendants

A sentence of time served is also necessary to avoid unwarranted sentencing disparities.

Based on the sentences that Mr. Orzanica's codefendants have received, a sentence of time

served is warranted. Two defendants who, like Orzanica, primarily participated in "cash-outs**,**"

but who were each responsible for $553,424 in losses, more than Mr. Orzanica, and who were

involved in more skimming transactions than Mr. Orzanica, were sentenced to 24 months'

incarceration. *See* ECF No. 297 (imposing sentence of 24 months on Dragos Diaconu); ECF No.

527 (imposing sentence of 24 months on Madlin Alexander Anca). Sentencing Mr. Orzanica to

time served, an equivalent to an effective term of approximately 20 months, would be proportionate to these sentences.

E.      A Sentence of Time Served Would Enable Mr. Orzanica to Obtain Needed Medical Care

A sentence of time served is also warranted to provide Mr. Orzanica with necessary medical and psychiatric care. As explained above, Mr. Orzanica was scheduled to have surgery to correct his undescended testicle prior to his arrest, but correctional authorities have refused to schedule him to see a urologist while incarcerated. Given these delays, if Mr. Orzanica is sentenced to a further term of incarceration, there is no telling when he may be able to get the medical care he needs. Once Mr. Orzanica returns to Romania, he can have this necessary surgery and reduce the chance that he will contract testicular cancer.

Similarly, Mr. Orzanica has been denied all but the most cursory of mental health services while incarcerated, to the great detriment of his mental and physical condition. Once released, he could seek the psychotherapeutic treatment he needs to provide an emotionally healthy, nurturing environment for his daughter. Dr. Barber notes that "[p]sychotherapeutic treatment is recommended for him once he returns to Romania and can engage in services with someone fluent in his language and culture. This will help Mr. Orzanica resolve the symptoms of depression and anxiety that he has experienced over the course of his life, especially since his divorce, and which have been exacerbated greatly by his incarceration, leading to the development of an Adjustment Disorder." Barber Rep. at 9.

Conversely, prolonged incarceration is likely to result in deterioration of his mental condition, and potentially even risks causing more serious psychological illness. *See id.* at 8 (noting that Mr. Orzanica's "familial history of serious psychiatric disturbance" could "increas[e] his vulnerability to developing a more serious disorder under conditions of prolonged stress"); *id.*

18

at 9 ("[C]ontinued incarceration is not necessary to effectively deter future similar behavior, and in fact may likely contribute to continued deterioration of Mr. Orzanica's mental health."). The potential for further deterioration of Mr. Orzanica's mental health condition is of particular concern given the extensive history of debilitating mental illness in Mr. Orzanica's immediate family. To provide Mr. Orzanica with access to the medical and mental health care he sorely needs, a return to Romania through a sentence of time served is warranted.

## III.   Conclusion

Mr. Orzanica was a brief and low-level participant in a much bigger conspiracy. He has suffered greatly during his pretrial incarceration as a result of his mental illness, his medical conditions, his separation from his family, and the strict lockdowns caused by the pandemic. By any measure, he has already endured sufficient punishment for his small role in the charged offense. We respectfully ask the Court to impose a sentence of time served and permit Mr. Orzanica to return to his family.

Dated:  April 2, 2021

Respectfully Submitted,

/s/ Kristen Santillo

Kristen M. Santillo
Samuel Steinbock-Pratt
Gelber & Santillo PLLC
347 West 36th Street, Suite 805
New York, New York 10018
(212) 227-4743